Kim STEVENS, Appellant,

v.

The STATE of Texas, State.

No. 2–05–237–CR.

Court of Appeals of Texas,
Fort Worth.

Aug. 23, 2007.

Cary Piel, Denton, TX, for Appellant.

Lisa Tanner, Asst. Dist. Atty., Austin, TX, for the State of Texas.

PANEL F: WALKER, J.; CAYCE, C.J.; and LIVINGSTON, J.

## OPINION

SUE WALKER, Justice.

### I. INTRODUCTION

Appellant Kim Stevens appeals her conviction and life sentence for the offense of capital murder. Stevens argues in four points that the evidence is factually insufficient to support her conviction, that the trial court erred by allowing an adult witness to testify by two-way closed circuit television, that the trial court erred by allowing a social worker to give hearsay testimony that did not in fact fall within the medical-diagnosis-or-treatment exception to the hearsay rule, and that the trial court violated Stevens's due process rights by excluding testimony that she claims was vital to her defense. We will affirm.

### II. BRIEF FACTUAL BACKGROUND

During the afternoon of January 4, 2000, Stevens took Jorden Saager, a two-and-a-half-year-old girl whom she was babysitting, to the doctor. The nurses at the doctor's office rushed Jorden back to a

room at the doctor's office and shortly thereafter called 911. An ambulance arrived and took Jorden to the hospital, where doctors pronounced her dead approximately twenty minutes later.

The autopsy revealed that Jorden had a fairly recent fracture that was four to five inches long on the back left part of her skull, that her duodenum had been transected such that the two ends of Jorden's bowel were completely torn apart, and that she had bruises all over her body. The medical examiner who performed Jorden's autopsy stated that death was caused by shock and sepsis as a result of the separation of the bowel and that the head injury could have contributed to Jorden's death. A jury convicted Stevens of murder for causing Jorden's death, and this appeal followed.

## III. FACTUALLY SUFFICIENT EVIDENCE TO SUPPORT CAPITAL MURDER CONVICTION

In her fourth point, Stevens contends that the evidence is factually insufficient to support her conviction for capital murder. Specifically, Stevens argues that there was almost no evidence of her guilt; she argues that there was evidence only of a homicide and that both she and Jorden's parents had the opportunity to commit the crime. Thus, she argues that the jury was forced to choose between herself and Jorden's parents as the perpetrator of the offense. Because the jury's verdict is based primarily on circumstantial evidence and because Stevens told numerous people slightly different stories about the events that transpired on January 4, 2000, we set forth an extremely detailed summary of the facts below.

### A. Standard of Review

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party. *Watson v. State*, 204 S.W.3d 404, 414 (Tex.Crim.App.2006); *Drichas v. State*, 175 S.W.3d 795, 799 (Tex. Crim.App.2005). We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the fact-finder's determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the fact-finder's determination is manifestly unjust. *Watson*, 204 S.W.3d at 414–15, 417; *Johnson v. State*, 23 S.W.3d 1, 11 (Tex.Crim.App.2000). To reverse under the second ground, we must determine, with some objective basis in the record, that the great weight and preponderance of all the evidence, though legally sufficient, contradicts the verdict. *Watson*, 204 S.W.3d at 417.

In determining whether the evidence is factually insufficient to support a conviction that is nevertheless supported by legally sufficient evidence, it is not enough that this court "harbor a subjective level of reasonable doubt to overturn [the] conviction." *Id.* We cannot conclude that a conviction is clearly wrong or manifestly unjust simply because we would have decided differently than the jury or because we disagree with the jury's resolution of a conflict in the evidence. *Id.* We may not simply substitute our judgment for the fact-finder's. *Johnson*, 23 S.W.3d at 12; *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim.App.1997). Unless the record clearly reveals that a different result is appropriate, we must defer to the jury's determination of the weight to be given contradictory testimonial evidence because resolution of the conflict "often turns on an evaluation of credibility and demeanor, and those jurors were in attendance when the testimony was delivered." *Johnson*, 23 S.W.3d at 8. Thus, we must give due deference to the fact-finder's determinations, "particularly those determinations concerning the

weight and credibility of the evidence." *Id.* at 9.

An opinion addressing factual sufficiency must include a discussion of the most important and relevant evidence that supports the appellant's complaint on appeal. *Sims v. State,* 99 S.W.3d 600, 603 (Tex. Crim.App.2003).

## B. The Evidence[1]

### 1. The Facts Concerning The Events Leading Up To Jorden's Death

#### a. General Background

Yolanda and Lloyd Saager met while they were both in the Army and married. At the time of the trial, they had been married for eleven years. Their children are Branden, who was born in 1994; Alyssa, who was born in 1996; and Jorden who was born in 1997. Yolanda was discharged from the Army after she gave birth to Branden and stayed home to raise the children. When Lloyd was discharged from the Army in July 1999, he was offered a job as a field service technician for Remstar in Plano, and the family decided to move in with Yolanda's "Grandpa," Clyde Ward,[2] in Gainesville until they could find a place to live.

Stevens lived next door to Ward with her three children. Yolanda met Stevens in August or September of 1999. While their children played together, Yolanda got to know Stevens and felt that she could trust her.

In the fall of 1999, Lloyd and Yolanda noticed that Jorden started having health issues.[3] They thought that she was devel-oping allergies and petechiae because she had an ear infection and little red dots on her hands. Yolanda was concerned about Jorden because Yolanda's grandmother had been diagnosed with a bleeding condition during the preceding year, and petechiae was one of the symptoms. Yolanda took Jorden to Dr. Gibbs, who gave Jorden antibiotics to clear up the ear infection and the petechiae.

#### b. Stevens Becomes Babysitter for Saagers

Later that fall, Yolanda obtained a job as a phlebotomist with LabCorp. Prior to starting this job, Yolanda talked with Stevens about not having child care, and Stevens agreed to take care of Yolanda's children while Yolanda worked. Stevens told Yolanda that she was a pharmacist and had been through EMT training, and that made Yolanda feel better about this arrangement.

Yolanda testified that her work hours were 8:00 a.m. to 1:00 p.m. and that she would drop Alyssa and Jorden off at Stevens's house around 7:15 a.m., take her son Branden and Stevens's daughter Taylor to school, and then pick up her children from Stevens's house around 1:30 p.m. after she got off work.

#### c. Jorden Gets Injured on her First Day at Stevens's House

On Yolanda's first day of work, which was November 16, 1999, she picked up her children at 6:30 p.m. because she had been at an all-day training. When she picked up the children, she noticed that Jorden's elbow was swollen and that she had a faint

---

1. As set forth below, the exact time that the fatal injury was inflicted is disputed according to the expert testimony; it may have occurred up to forty-eight hours before Jorden's death. Consequently, the events in the days immediately preceding Jorden's death are relevant, and we detail those events in our evidentiary review.

2. Ward is Yolanda's stepfather's father.

3. Before their move to Gainesville, the Saagers had only taken Jorden to the doctor for well-baby exams.

bruise across her head. Stevens told Yolanda that the children were outside playing on a toddler car and that Jorden had gotten pushed out.[4] Yolanda thought that Stevens's explanation seemed reasonable because Stevens had a cement patio in part of her backyard. Yolanda was upset, however, at how Jorden looked and called Dr. Gibbs's office and made an appointment for the next day.

### d. Dr. Gibbs Refers Jorden to Cook Children's Hospital

The bruise on Jorden's head had healed by the time she saw Dr. Gibbs the next day, but he and Yolanda talked about the red spots on Jorden's hands again. Dr. Gibbs read through his books to see if Jorden possibly had a bleeding problem like Yolanda's grandmother, and he decided to refer Jorden to an oncologist at Cook Children's Hospital.

### e. Examination at Cook Children's Hospital Reveals No Disease

Yolanda took Jorden to Cook Children's Hospital on December 7, 1999. There, a bleeding time test, a complete blood count, and a physical exam were performed. Yolanda said that she told the doctor that she was concerned because Jorden kept getting bruises.[5] The doctor said that he would repeat the diagnostic tests in three months, but that there was nothing medically wrong with Jorden at that time.

### f. Christmas in Indiana Was Bruise–Free

To celebrate Christmas, the Saager family drove to Lloyd's father's house in Indiana and stayed there approximately one week. Yolanda and Lloyd noted that during that time, Jorden had no bruising or health issues, though she did slip on the ice and re-injure the finger that Alyssa had accidentally slammed in a drawer prior to the trip.[6]

### g. New Year's Eve at Stevens's House

On New Year's Eve, beginning at around 9 p.m., Stevens kept the Saager children. Lloyd admitted that he had a few drinks with Ward that night. During that evening, Yolanda and Lloyd had "a spat," so Yolanda went to bed, and Lloyd went to Stevens's house to pick up the children at around 3 or 4 a.m. He noted that Stevens's ex-husband was there.

### h. Days Preceding Death

The next morning, the spat was over, and nothing abnormal occurred on Saturday, January 1, 2000. On January 2, 2000, the Saager family watched movies and played. Stevens did not keep the Saager children on January 2.

On January 3, Lloyd left for work between 5:30 and 6:30 a.m., Yolanda left for work around 7:15 a.m., and all the children went to Stevens's house. Yolanda testified that when she arrived at Stevens's house after work to pick up her kids, there was a note on the screen door saying that they had gone to the zoo. Yolanda went to the zoo, found the kids near the entrance, and

---

4. Lloyd was on a business trip during Yolanda's first week of work. When he returned, he saw that Jorden's arm was swollen and became upset because he did not understand how Jorden's fall from a toy car could have caused such a significant injury. Lloyd asked his daughter Alyssa about Jorden's fall, and Alyssa said that she did not see Jorden fall but that Stevens had told her about it.

5. Jorden did not get bruises every day that she stayed with Stevens. Yolanda testified that if Jorden had come home with bruises every day, she would not have let her stay with Stevens.

6. One time when Yolanda went to pick up the kids from Stevens's house, Stevens told her that Alyssa had accidentally slammed one of Jorden's fingers in a drawer.

saw that Jorden had a small purple bruise under her eye. Stevens said that Jorden had been playing on the teeter-totter, that Alyssa had gotten up too quickly, and that the teeter-totter had hit Jorden in the eye. Stevens also told Yolanda that Jorden had stuck her hand in a birdcage and had gotten pecked. Yolanda was concerned about rabies, so they talked to the curator, who said to treat the circular mark like a cut.[7]

After they left the zoo, Yolanda took the kids to Ward's house, got her checkbook, and took the kids with her to Plano so that she could sign the rental papers for a town home that they were planning to move into and to move in a load of their belongings. Yolanda said that the kids ran around the town home [8] and that Branden stepped on Jorden's finger and injured it a third time.

When they arrived back at Ward's house, Yolanda fed the kids a quick dinner of peanut butter and jelly sandwiches. Lloyd arrived home between 7:30 and 8:00 p.m. as the kids were eating. Lloyd saw that Jorden was in her high chair and heard her yell, "Daddy!" as usual. When Lloyd got closer to Jorden, he could see what looked like eyeliner on her eyes. Lloyd asked what was wrong with Jorden's eye, and Yolanda said that it was a bruise from getting hit with the teeter totter.

Lloyd and Yolanda had planned to pack up Lloyd's truck to take another load of their belongings to the town home in Plano; they all went to Wal–Mart to purchase a tarp to cover the items that they were moving. After they finished loading the truck, Jorden said that her tummy was hurting, and Yolanda noticed that Jorden's stomach looked bloated. Lloyd and Yolanda thought that the milk Jorden had drunk with her sandwich had given her gas because Lloyd is allergic to milk. So Lloyd laid Jorden on the bed; rubbed her stomach with soft, slow, deliberate strokes; and tried to work her legs to help her expel the gas. Yolanda said that she was present and that Lloyd was not rubbing Jorden's stomach forcefully, but that he did not have any luck in relieving Jorden's discomfort.

Yolanda and Lloyd decided that it was too late to make another trip to Plano. They put Alyssa and Brandon to bed, and Yolanda tried to rock Jorden to sleep. Yolanda could not get Jorden to sleep, so she simply put Jorden to bed, and Jorden slept through the night.

### i. Day Of Death

7. William Baker, Jr. testified that on January 3, 2000, he was the curator of Frank Buck Zoo in Gainesville. He said that two women with a child had asked to speak to someone in charge because a young girl had placed her hand into the East African Crowned Crane exhibit and had gotten pecked on the hand. He said that the little girl walked up on her own, that he inspected her hand, and that he saw a very minor surface indentation but no bleeding. He noted that Jorden seemed quiet and subdued and that he did not notice anything unusual about her. He said that Stevens was rude and belligerent and that Yolanda seemed very concerned about her child's welfare. He assured them that the animals were in good health.

8. Diane Rafear testified that she manages town homes in Plano and that Yolanda picked up the keys to their town home on January 3, 2000. Rafear noted that Yolanda's daughter had extremely red eyes and discoloration around her mouth that looked blue. Rafear, who used to work for cardiologists, thought Jorden had a heart disease, but Yolanda told her that it was due to allergies because they lived in an older home. Rafear testified that Jorden looked normal, other than the red eyes and blue mouth, and that she ran up and down the carpeted stairs inside the town home with her siblings. Rafear said that she commented about the noise that the children were making.

When Jorden woke up the next morning, January 4, she said that her tummy was hurting. Before Lloyd left for work, Yolanda made Jorden eggs and toast so that Jorden would not have to eat cereal with milk, the suspected culprit of Jorden's stomachache. Jorden only ate a bite or two. When Yolanda took the kids to Stevens's house and dropped them off, she told Stevens that Jorden's stomach was upset and that Jorden should ingest only Sprite and crackers.

While Yolanda was at work, she did not receive any updates from Stevens regarding Jorden's condition. After Yolanda got off work, Tracy Lester, the office manager at the doctor's office where Yolanda worked, answered a call from a lady who said that she babysat Yolanda's children but would not leave her name.[9] Lester told the caller that Yolanda had just left for the day. The caller said that she did not want to leave a message. When Lester asked again if she could get the caller's name, the caller hung up. Lester testified that the caller did not seem worried.

Meanwhile, Yolanda went home to use the restroom before she picked up her children, and while she was at home, the Gainesville Hospital called and told her to come immediately. Yolanda said that she went to the emergency room, that a doctor came into Jorden's room and closed the door, and that the doctor then told her that Jorden had died. Yolanda got on her knees and cried.

Around the same time, Lloyd was on a break at work and received a call from a nurse at Dr. Gibbs's office. The nurse told him that his daughter had fallen on the playground at Burger King, that she was on her way to the emergency room, and that he needed to go to the hospital in Gainesville. Lloyd got in his truck and left.

While he was driving, his head was reeling, so he called his dad in Indianapolis. Lloyd realized that he had failed to ask the nurse which of his daughters had fallen. Lloyd's dad told him to stop his truck and to call the highway patrol for an escort because he did not need to be driving while he was so frantic and also to call the emergency room.

Lloyd skipped the call to the highway patrol but called the emergency room. Dr. Gibbs, who was at the hospital emergency room, got on the phone and told Lloyd that Jorden had passed away twenty minutes earlier. Lloyd screamed and yelled at the doctor and then called his dad, who said that he would be on his way.

When Lloyd arrived at the emergency room, Stevens came over with a glass of water, and he sat down. He could not control his breathing, was hyperventilating, and went into shock. Lloyd saw Jorden for a little while and noticed her bluish coloring.

Lloyd and Yolanda did not obtain any information from Stevens at the hospital. Consequently, they believed that Jorden had been misdiagnosed by the medical professionals and that she must have died from a blood disorder.

Later that day, Lloyd and Yolanda went to talk to CPS. CPS decided to take the Saagers' other two children for emergency protection.

When Lloyd and Yolanda got home, Yolanda went into their house, and Lloyd went over to Stevens's house to find out what had happened. Stevens told Lloyd that she had taken the kids to Burger King and that Jorden was not feeling well. Stevens said that she decided to take the

9. The State admitted phone records showing that on January 4, 2000, the doctor's office where Lester and Yolanda worked had received a phone call at 1:08 p.m. from Stevens.

children home and that, when Jorden climbed out of the car, she fell on her Burger King cup. Lloyd talked to Stevens for about an hour before Yolanda came over. While Lloyd and Yolanda were at Stevens's house, Stevens reached into her dryer and pulled out some of Jorden's clothes,[10] which the Saagers eventually gave to the authorities.

#### j. Day After Death

The next day, January 5, Lloyd and Yolanda made phone calls to see if the autopsy was done because CPS had told them that if the autopsy revealed that Jorden had died of some rare disease, then they could have their children back. However, they learned that day that Jorden had not died from some undiagnosed blood disease; the authorities had ruled Jorden's death a homicide. Lloyd said that he was horrified when he heard the results.

Thereafter, police detectives asked the Saagers to come to the police station. The Saagers talked to the detectives for several hours, during which time the detectives accused Lloyd and Yolanda of hurting Jorden. The detectives also accused Yolanda of covering up for Lloyd. However, Lloyd and Yolanda both said that there was no time on January 3 or January 4 when either Lloyd or Ward were at home alone with Jorden. Yolanda said that her children are very important to her and that she had no concerns that Lloyd or Ward had anything to do with Jorden's death; Lloyd said that he did not believe that Yolanda or Ward caused Jorden's death. Lloyd did not complete his statement to police that day because his father caught him on a smoke break and told him not to

go back in and talk to the police because he had hired a lawyer. Lloyd said that he was fearful of what would be inferred if he hired a lawyer, but he followed his dad's instructions.

Lloyd testified that he was never arrested or placed in custody for Jorden's death. Lloyd also testified that he did not have anything to do with Jorden's death.

#### k. The Years After Jorden's Death

Despite the fact that prior to January 4, 2000, Lloyd and Yolanda had never been investigated by CPS,[11] it took fifteen months for the Saagers to get Alyssa and Branden back after Jorden's death. When Alyssa and Branden were returned to Lloyd and Yolanda, they put Alyssa and Branden in counseling with Dr. Dayna Fuchs. The kids stayed in counseling approximately one year, and during that time, Yolanda and Lloyd also met with Dr. Fuchs.

During the three years that Jorden's case was pending,[12] Yolanda, with Lloyd's support, went to the FBI in Sherman and tried to get the FBI to investigate Jorden's death; she was told that the matter was outside the FBI's jurisdiction. Lloyd and Yolanda contacted their state representatives in Fort Worth, they picketed with "Justice for Jorden" posters outside the courthouse, they called the detectives every week for a year and a half, and they did research at Southwestern University to try to figure out what had happened to Jorden. Despite the Saagers' best efforts, it took a long time for the story of Jorden's death to be pieced together; many people knew only portions of the big story.

10. Yolanda testified that to her knowledge, Stevens had never washed Jorden's clothes before that day.

11. Alyssa had surgery in Georgia when she was two or three months old because she had

pyloric stenosis, but no CPS organization investigated the Saagers based on that surgery.

12. The police arrested Stevens in 2003 for Jorden's death.

## 2. Facts Concerning the Medical Events of Jorden's Death

### a. Rachel Moore, LVN

Rachel Moore, who worked at Dr. Gibbs's office, testified that on January 4, 2000, she saw Jorden with Stevens at about 1:30 p.m. Stevens had Jorden in her arms, approached the front desk, and asked for Jorden to be seen right away. Moore described the way Stevens was carrying Jorden as "like a sack of potatoes." Moore said that Jorden was limp and that her head bounced with every step that Stevens took. Moore thought that Stevens should have cradled Jorden; based on what Moore saw, she did not believe that Jorden could have walked into the office on her own. Moore initially gave Stevens a clipboard to sign in on but then told her to go back immediately to the surgery room.

A few seconds later, Moore met Stevens in the surgery room and had Jorden lie on a chair. Moore saw that Jorden did not look good and called out for someone to dial 911. Moore checked for Jorden's pulse and respirations and asked Kathleen Cravens, a registered nurse, to come help. Moore testified that Jorden had a greenish cast to her, that she was "dusky looking," and that she had a small bruise on her forehead. Jorden was not breathing regularly, but Cravens was able to find a pulse. Moore and Cravens held an oxygen mask in front of Jorden's face because she was tossing and turning. Jorden did not appear to be alert and was not responding to them verbally.

The EMS arrived promptly, and the nurses stepped out of the room to allow EMS to take over. As the EMS were leaving with Jorden, Dr. Gibbs arrived back from lunch and caught up with them.

Moore felt that Jorden's condition was so serious that she called Lloyd's work number and asked his employer to locate him. However, she was worried that he would not arrive at the hospital before Jorden died.

Moore testified that she interacted very little with Stevens but that Stevens seemed anxious. Moore overheard Stevens say that Jorden had fallen down at Burger King and that Stevens had left a note for Yolanda. Moore found out later that afternoon that Jorden had died, and she was not surprised based on her observations at the clinic.

### b. Janice Kathleen Cravens, RN

Cravens testified that she works primarily with Dr. McLeroy at McLeroy, Gibbs, & Klein Clinic, a family clinic. On January 4, 2000, they had an emergency situation at the clinic sometime between 1:00 and 1:30 p.m. Moore, who was in the procedure room, yelled for help, so Cravens joined her. Cravens testified that she saw a little girl lying on the table with bad color—her hands were blue. The girl was "pretty limp" and appeared to be unconscious but was moving a bit. Cravens's first impression was that the little girl was in serious trouble; so the second that she saw Jorden, she yelled, "Call 911," and the office manager made the phone call.

Cravens said that Jorden's eyes were closed, so she did not check Jorden's pupils. Jorden did not respond to her name or to touch and did not verbalize anything or even cry. Jorden had a bruise on her forehead, her nose was a little bloody, and her abdomen was very distended. Cravens and Moore held an oxygen mask to Jorden's face because she kept turning her head from side to side like she was aggravated by it. Dr. Gibbs was not there at that time.

Cravens testified that the EMS arrived very quickly, looked at Jorden very briefly, and took her out to the ambulance in their

arms. Dr. Gibbs arrived and went to meet the EMS.

Cravens talked to Stevens briefly and found out that she was the babysitter. Stevens gave Cravens the impression that Jorden was ill because Stevens said that Jorden had been vomiting, so Stevens had only given her Sprite and crackers. Cravens asked Stevens about Jorden's head and nose, and Stevens said that she was at Burger King and that Jorden had gotten "wobbly" and had fallen onto the sidewalk face forward. Stevens said that she picked up Jorden and brought her to the doctor's office straight from Burger King. Cravens included in her nurse's statement, which she made from the medical records, that Stevens had told her that Jorden had played with other kids at Burger King and that she had started getting ill on the way back to the car after playing.

Cravens testified that the hospital was closer to Burger King than the clinic and that, in retrospect, it struck her as odd that Stevens brought Jorden to the clinic instead of the hospital; a child that severely ill should have been taken straight to the emergency room. Cravens knew within an hour of Jorden's departure from the clinic that she had died; Cravens was not surprised because she knew that Jorden was in serious trouble when she saw her.

### c. David Andrews, EMT

David Andrews, a licensed paramedic and EMT, testified that he was dispatched at 1:36 p.m. on January 4, 2000, along with three others, to an emergency at Dr. Gibbs's clinic. They arrived at 1:39 p.m. and found Jorden lying on a bed in one of the clinic rooms. Jorden was unresponsive, her pupils were fixed and dilated, her abdomen was distended and very rigid, and she was still breathing on her own but only eight times a minute. Andrews noticed bruising on Jorden's forehead and face. Andrews picked up Jorden in his arms, ran to the ambulance with her, and attempted several procedures there.

Andrews tried to intubate Jorden, but her teeth were clenched such that he could not get the tube down her throat. Andrews attempted to start an IV line but was unsuccessful. They worked on Jorden for a little while before Dr. Gibbs joined them and also attempted unsuccessfully to intubate Jorden as they transported her to the hospital. When they arrived at the hospital at 1:49 p.m., Andrews carried Jorden in to the emergency room doctors. Afterwards, he sat and wrote his report.

Stevens told him that the child's mother had told her that morning that Jorden was spitting up and instructed Stevens not to give Jorden any food, only something to drink. Stevens said that she took the children to Burger King to play and that she only gave Jorden a Coke. Stevens stated that after they got home, Jorden got out of the vehicle, took a few steps, and fell forward. She said that she picked up Jorden and put her in bed. Later, she went to check on Jorden and thought that she just did not look right, so she took her to Dr. Gibbs's office. Stevens was not emotional (i.e., she was not crying and did not appear upset) when he talked to her; she was very straightforward with her story. Andrews stated that even if Stevens had received EMT training, which would help her remain calm in stressful situations, he would have expected some type of distress from her because she was Jorden's babysitter and would have some type of intimate relationship with the child.

Andrews was still at the hospital when the doctors pronounced Jorden dead. The news of her death did not surprise him because of the way Jorden had presented; her heart had basically stopped when he carried her into the hospital, and her injuries were incompatible with life. He noted

that a lot of people who sustain traumatic injuries have clenched teeth in response to the injury. He stated that Jorden's fixed and dilated pupils indicated that she had suffered a serious injury, as did her rigid, distended abdomen. Andrews said that he did not know what had caused Jorden's death.

### d. Dr. Mark Gibbs, Family Doctor

After lunch on January 4, 2000, Dr. Gibbs arrived at his clinic to find an emergency; an ambulance was in the carport, which was not a common occurrence. He found Jorden in the ambulance and noticed that she was blue, was not breathing, was bruised from head to toe, and was physically traumatized. He found a little bit of a french fry in the corner of her cheek when he was trying to intubate her. He was unable to intubate Jorden because of the movement of the ambulance; she was "bagged" with an ambu bag during the ride to the hospital. Jorden died within a few minutes of arriving at the hospital.

Dr. Gibbs talked to Stevens when he walked through the clinic on his way to the ambulance. He said that she was evasive and that he did not really understand her story because she gave two different accounts in the sixty seconds that he talked to her. Stevens told Dr. Gibbs that the children were at Burger King and that Jorden had fallen. Dr. Gibbs asked Stevens if Jorden had come to the clinic immediately after the fall, and Stevens said no. Stevens then said that she had taken the children home and that Jorden had fallen on the sidewalk. Dr. Gibbs asked whether Jorden had fallen at Burger King or on the sidewalk, and Stevens replied that Jorden had fallen on the sidewalk. Dr. Gibbs testified that he thought it was odd that Stevens did not have an exact record of an event that had just happened moments beforehand that involved a significant injury. He described Stevens as nervous and said that Jorden's injuries and condition were not consistent with a fall.

Dr. Gibbs said that Yolanda was an emotional wreck when she learned of Jorden's death. Dr. Gibbs stated that Lloyd called in while he was driving to the hospital and wailed like Dr. Gibbs had never heard before when he gave Lloyd the news of Jorden's death.

Dr. Gibbs testified that on the day that Jorden died, none of the medical professionals knew for sure what had killed her. He said that he did not hear anyone at the hospital say that Jorden had died of a ruptured spleen or a head injury or that she had been hit with a broomstick.

### e. Dr. Benjamin Respess, ER doctor

Dr. Respess testified that he was an emergency room physician on January 4, 2000, and that the emergency room received a call that an ambulance was bringing in a critically ill child from Dr. McLeroy's office. Dr. Gibbs brought the child through the emergency room door at 1:51 p.m., and she was clinically dead when she arrived. Immediately after Jorden arrived, the emergency room staff examined her and noted that she had breath sounds, that her abdomen was distended, that she had pulseless electrical activity (i.e., there was electrical activity in her heart, but it was not producing anything) which dropped within a minute to no cardiac output of any type, and that she had bruising on her face, forehead, and abdomen. They started CPR and called anesthesia, which got her intubated. They also put two large bore IVs in her and went through the Pediatric Advanced Life Support protocol, giving her medications to restart her cardiovascular system. They worked on Jorden for eighteen minutes before pronouncing her dead at 2:09 p.m.

Dr. Respess testified that they noticed a lot of things about Jorden as they were working on her, but they did not have a lot of information about what might have happened to cause the tragedy. For instance, when they put a nasogastric tube down her nose to her stomach to try to get out the air that was caused by her being bagged with oxygen on the way to the hospital, they got nothing, which told them that her abdomen was not distended due to air. He said that someone pointed out that Jorden's rectum was dilated. Dr. Respess testified that the rectum can become dilated after any central nervous system trauma or with cardiovascular collapse and that he did not have any concerns that Jorden had been sexually assaulted because the rectal dilatation looked like the product of injury and the dying process.

Dr. Respess described photos of Jorden that were admitted into evidence. He testified that Jorden had bruises on non-weight bearing areas, such as her medial right thigh, which is an area where the child would not bruise if she fell. Consequently, he said that he felt there was a force applied to that area to cause the injury. He said that Jorden had bruising on her abdomen and that the blue lines were engorged veins on the abdominal wall. He also noted a handprint bruise on Jorden's back, a bruise on the back of her scalp, a bruise under the hair on her forehead, injuries on her eyelids and on the right side of her face, and two separate abrasions on her head, one of which was buried in her hair. Dr. Respess questioned the parents about family medical history and learned that they had a history of blood dyscrasia (easy bruising). However, he also remembered hearing that Jorden and her family had gone on vacation, that the bruising had gotten better, and that it reappeared when they returned from vacation. Dr. Respess testified that the injuries he saw were not consistent with a child who had fallen face forward and that the medical procedures performed on Jorden would not have caused the abrasions to Jorden's head, the bruises to her body, or the distention of her abdomen.

On the day of Jorden's death, Dr. Respess did not hear any doctors or nurses say that Jorden had died of a ruptured spleen or a concussion. On January 4, 2000, he had no idea how Jorden had died; he did not find out the cause of her death until the week before trial.

Dr. Respess said that in his twenty-seven or twenty-eight years as an emergency room doctor, he has never had a patient (other than Jorden) with a completely transected duodenum, which he said is a tremendous injury. He said that somebody with that injury would not function for very long because just a pinhole in the bowel would cause a person to get very sick within a few hours. He stated that if a child is not acting properly, she has probably been sick for longer than an adult because a child has reserves of energy and will act through a lot of pain. However, once a child begins to go downhill, it is not unusual for her to crash quickly.

### f. Audi Hayes, RN

Audi Hayes, a registered nurse who was employed at Gainesville Memorial Hospital on January 4, 2000, testified that she first saw Jorden as she was being brought in through the emergency room doors by the ambulance crew. Hayes echoed Dr. Respess's testimony regarding the procedures that they performed on Jorden. Hayes noticed that there was bruising on Jorden's lower back, extremities, and around her face. Hayes said that Jorden's rectum looked unusual because it was pushed out but testified that she is not a sexual abuse nurse examiner and that the rectal disten-

tion could be the result of the pressure in Jorden's stomach.

Hayes understood that Stevens was Jorden's babysitter. Hayes specifically asked Stevens if Jorden had fallen, and Stevens said, "No." Hayes remembered that, after Jorden died, Yolanda held her for a long time and wailed. Although Stevens was sitting in the same room with Yolanda, Stevens did not console Yolanda. Hayes also remembered Yolanda's saying that their family had gone on vacation and that Jorden had "gotten better," but when they came back, the bruising started again. Hayes did not recall any discussion among the medical personnel regarding Jorden's having been hit with a broomstick.

### 3. Facts Concerning the Investigation After Jorden's Death

#### a. Alicia Burseron, Gainesville PD

Alicia Burseron, who was employed by the Gainesville Police Department in January 2000, received a call on January 4, 2000, to go to Gainesville Memorial Hospital emergency room to investigate a possible assault on a child resulting in death. When Burseron arrived, she recognized Stevens from the day before.[13] Burseron asked Stevens why she was there, and Stevens said that she had brought in the child who was in the emergency room; Burseron immediately connected Stevens to the child that she (Burseron) already knew was deceased. Burseron thought Stevens's demeanor was odd; Stevens did not act concerned or upset, as Burseron would expect of someone who had brought a seriously injured child to the emergency room.

Burseron went and saw Jorden, who looked different than the day before. Burseron saw that Jorden was bruised all over and that her stomach was bloated. Burseron was present when the parents said their final goodbyes to Jorden and testified that both parents appeared genuinely grief stricken.

Burseron talked to Stevens again, after Stevens was detained by police. Stevens said that she had met the Saagers at the end of August 1999 and had started babysitting Jorden in November. Stevens said that Jorden had been sick to her stomach and sick in general ever since she met her. On the day in question, Stevens said that she had taken Jorden and her kids to Burger King and that they had played on the playground. Burseron wrote in her report that Stevens told her that Jorden had not been feeling well all day and that Stevens had been advised by Jorden's mother not to feed Jorden anything to upset her stomach. Stevens said that Jorden had one french fry and some Sprite at Burger King. Stevens said that Jorden rubbed her eyes as if she were tired, so Stevens took the children to her house to lay them down for a nap. Stevens stated that when Jorden was walking from the vehicle to the residence, she seemed very lethargic and fell face down, dropping her drink. Stevens said that Jorden's fall occurred in the driveway and that the fall caused a laceration to Jorden's lip. When Stevens laid Jorden down for a nap, she was crying from the fall and seemed uncomfortable. Stevens told Burseron that she put Jorden's arms over her chest and rocked her from side to side. Stevens said that Jorden's lips and eyes were swollen and that Jorden vomited numerous times.

13. Burseron testified that on January 3, 2000, she was looking for a particular house when she met Stevens. Burseron spoke with Stevens, who told her that she was new to the area. Burseron saw several children, including a two-year-old girl who was wearing a fireman's hat and running around with a diaper on. Burseron did not notice any bruises on the child and did not think that the child looked sickly.

Stevens told Burseron that she left a note on the door to tell Yolanda that they had gone to the park,[14] but Burseron could not remember if Stevens told her why she left a note saying that they were going to the park when in fact Stevens took Jorden to Dr. Gibbs's office. Stevens said that she took Jorden to Dr. Gibbs's office and that, during the exam, Jorden's lips turned blue. Stevens said that a nurse called for an ambulance to transport Jorden to the emergency room, that Dr. Gibbs rode in the ambulance, and that she drove her vehicle to the emergency room.

### b. Bill Freeman, Former JP

Bill Freeman, who was formerly the justice of the peace for Cooke County, received a call to go to the hospital on January 4, 2000, in response to an unnatural death. When he arrived, Jorden was on a stretcher in a trauma room and had multiple bruises all over her body, including one in the middle of her back in the shape of a handprint. Freeman learned that Stevens was Jorden's caretaker, so he questioned her.

Freeman noted that Stevens was not in any type of emotional distress at the hospital and that her primary focus was explaining Jorden's bruises. Initially, Stevens told him that Jorden had a blood disorder—diagnosed at Cook Children's Hospital—that caused her to bruise easily. Stevens said that Jorden had gotten out of the car with a Coke cup and was holding it with both hands. Stevens stated that Jorden stumbled and fell forward. She did not try to catch herself, so she fell flat on her face. Stevens said that after Jorden fell, she got back up and walked into the

house. Stevens told Freeman that she laid Jorden in bed with her and that she kept rolling around and crying. Stevens said that she knew that Jorden was sick, so she took her to the doctor's office. Freeman said that Stevens's story might explain some of the bruises on Jorden's face, but it did not explain the bruises elsewhere on Jorden's body.

### c. Ronnie Williams, Gainesville PD

Ronnie Williams, who worked for the Gainesville Police Department in January 2000, assisted with the investigation of Jorden's death. He went to the hospital to talk to Stevens. They sat in his car and talked, and as soon as they were finished talking, he wrote down what Stevens had said. During this first interview, which occurred about 3:30 p.m., Stevens did not mention that Jorden had suffered any type of fall.

After interviewing Stevens, Williams and other detectives went to Stevens's house and entered with Stevens's permission. They took a diaper and the note that Stevens had left on the door for Yolanda. They took a Burger King cup [15] with liquid in it and a white bowl with a food substance in it. They noted that there were washed clothes in the washing machine, but Stevens did not give them any clothing items.

Around 5:55 p.m., the police took a more formal, recorded statement from Stevens. Stevens said that Jorden was wearing a purple jogging suit, that Jorden had thrown up on it, and that she had washed it. Stevens told the police that Jorden

---

14. Burseron later went to Stevens's house and saw the note on the back door. The note, which was admitted into evidence, read: "We are at the park. At the latest we'll meet you here after I pick up Taylor and Mason."

15. Although the property sheet stated that they took a Whataburger cup, this was clearly an error because the picture of the evidence showed a Burger King cup. The property list also contained another error, listing the date as "4/3/00" instead of "1/3/00."

seemed tired and did not want to play. However, Stevens took her to Burger King for lunch. During this interview, Stevens said that when they arrived home, Jorden exited the car, took four or five steps, and fell. After Jorden fell, Stevens said that she put Jorden down for a nap and later took her to the doctor.

Stevens mentioned that the Saagers had been investigated before by CPS. Stevens said that Yolanda had told her about the CPS investigation one night when she brought Jorden over because she was sick. Yolanda told Stevens that Branden's brain had swollen, that they had taken him to the hospital to relieve the pressure, and that the hospital staff had initiated a call to CPS. Stevens said that she did not know when the referral took place or whether the allegation was true, but she said that was the only time that the Saagers had been investigated.

### d. Dr. David Dolinak, Medical Examiner

Dr. David Dolinak, a forensic pathologist, testified that he performed the autopsy on Jorden on January 5, 2000. He described Jorden as a two-and-a-half-year-old female who was three feet tall and weighed thirty-six pounds—a normally developed, well-nourished toddler. He then proceeded to list Jorden's injuries.

Dr. Dolinak first mentioned the injuries that Jorden had on her extremities: a one-and-a-half-inch bruise on her left elbow, a one-inch bruise and a one-fourth-inch bruise on the back of her left forearm, and a three-fourth-inch abrasion on her right elbow. He said that there were no injuries on Jorden's legs.

He then described the injuries on her head: bruises in the inner parts of the eyelids of each eye, two small hemorrhages in the right lower eyelid, a one-eighth-inch scrape at the tip of her nose, a one-

fourth-inch scrape below her right nostril, a five-eighths-inch bruise in the middle of her forehead, a one-and-one-fourth-inch abrasion on the left upper forehead involving the hairline, a two-or three-inch area of bleeding or bruising underneath the forehead, a one-fourth-inch bruise to the side of her right eyebrow, a three-fourth-inch bruise on the left side of the head, a seven-eighths-inch bruise above the left ear, a three-fourth-inch bruise toward the back of the left upper region of the scalp, a one-inch abrasion near the middle of the back of the scalp, underneath which was a two-inch area of contusion in the scalp tissue, and a one-and-three-fourth-inch bruise in the right back of the scalp that had about a two-inch area of underlying bruise associated with it.

Jorden also had a skull fracture that was four to five inches long on the back left part of her skull. Dr. Dolinak considered this to be a significant fracture that would immediately have affected Jorden, causing her significant pain and resulting in her reacting "pretty noticeably." Because Dr. Dolinak did not see any healing attempts of the bone and because there was only a little inflammation in the tissue, he opined that the fracture was fairly recent. He said that he would have expected to see evidence of some brain injury, like bleeding beyond the surface of the brain and brain swelling, but he did not see anything like that. He explained the absence by stating that it was either an anomaly or that death had ensued soon after the fracture, causing the body not to have time for the brain to swell or for bleeding to occur.

Jorden had three bruises that lined up next to each other in the central part of her lower back, and those bruises comprised a one-and-three-fourth-inch by one-and-a-half-inch area. Dr. Dolinak testified that the bruises on Jorden's back may have resembled marks like fingers, but he

could not say for sure that a hand had caused them.

With regard to the bruises, Dr. Dolinak testified that some of the bruises looked older than others, but all of the bruises were there when the child died. He said that he ran iron stains, which showed older injuries in the mesentery, in the fingerlike bruises on the back, and in two of the bruises on the scalp. Those injuries were at least forty-eight hours old because it takes that long for an injury to test positive for iron; however, once an iron stain is positive, the iron can "hang around for quite a while."

Dr. Dolinak testified that Jorden's external genitalia looked normally developed and that he did not see anything unusual. Although the autopsy picture showed that her anus had lost its normal fold pattern, the autopsy report stated that the anus appeared atraumatic. He said that he did not see anything that would make him concerned that Jorden had been sexually abused.

Jorden's abdomen had a half-inch bruise on the left side and a kind of squared-off-looking bruise in the lower right abdomen near her belly button. Dr. Dolinak testified that if someone had stomped on Jorden's abdomen with a long heel, it might require less force to make this squarish imprint. Jorden's abdomen was distended and larger than Dr. Dolinak expected. When he opened up Jorden's abdomen, he discovered that approximately half a liter of bowel contents had escaped from her bowel and were in her abdominal cavity. Dr. Dolinak stated that the fibrinopurulent material that was found around Jorden's bowel takes approximately twenty-four hours to form. There were two tears in the mesentery tissue around Jorden's small bowel that would not have been immediately debilitating but would have caused pain and irritation. He also said

that Jorden's duodenum had been transected such that the two ends of her bowel were completely torn apart. Dr. Dolinak described this as a major injury to the duodenum, which could cause death. He said that it would take a severe impact for the duodenum to be transected and that such an impact would cause the duodenum to be sandwiched between whatever force was pressing down on the abdomen and the bony vertebral column that the bowel passes over.

After discussing the above findings, Dr. Dolinak testified that the cause of Jorden's death was shock and sepsis as a result of the transection of her bowel and said that Jorden's head injury could have contributed to her death. He said that he did not find evidence of any disease or medical condition that would have caused Jorden's death.

Dr. Dolinak was unable to pinpoint the exact time that Jorden's fatal injuries were inflicted. He said that it is often difficult to determine the precise point in time when an injury has occurred in a young child because of children's more varied reactions to injuries and pain. He stated that a person experiencing leakage of the small intestine might not have symptoms right away because the contents of the small intestine have a more neutral pH and are not as acidic as those in the large intestine. He said that he would have expected Jorden to complain of her head hurting, of her stomach hurting, and of being cold, from sepsis and shock. He stated that a child could easily lose consciousness from a skull fracture and would have had a headache, been groggy, looked dazed, and not been herself. He said that Jorden probably would have had a decreased appetite and eventually no appetite. But he opined that Jorden could have gotten over these initial symptoms

and continued to act like herself for some period of time.

Dr. Dolinak initially provided a time frame for Jorden's fatal injuries of twelve to eighteen hours before death. His autopsy notes indicate that his pathological findings were consistent with a finding that injuries were inflicted on Jorden on the evening of January 3, 2000. His notes further state that "it is difficult to believe, but not impossible, that Jorden may have been running around asymptomatic with those injuries at the apartment showing; but most likely, those injuries were inflicted after the showing."[16] He testified that he thought that Jorden could have run up and down stairs after the duodenum had separated. Dr. Dolinak's notes from April 2000 also echo this theory that Jorden's abdominal and head injuries were likely inflicted the evening before the day that she died based on the timing of her first complaints of head and abdominal pain. He clarified by stating that he understood that Jorden's eyes were watery, that she had bluish discoloration around her lips, and that the inside of her eyes were very red at 3:30 p.m. at the town home showing on January 3, 2000, which would indicate to him that something had already happened to Jorden. With regard to Jorden playing at Burger King, Dr. Dolinak testified that he would have expected her to be sicker because she died shortly thereafter and that it is possible that the fatal assault had not yet occurred.

He ultimately testified that Jorden's injury could have been inflicted anywhere from less than eight hours to forty-eight hours before her death. Based on this time frame and Jorden's death at 2:09 p.m. on January 4, 2000, Dr. Dolinak concluded that the fatal injuries occurred between 2:09 p.m. on January 2, 2000, and 6:09 a.m.

on January 4, 2000. Dr. Dolinak said that one reason that he had expanded the estimated time frame was because Jorden's duodenum may not have completely separated at the time of the blow and because he had reviewed literature on the subject and had discussions with surgeons.

Dr. Dolinak testified that Jorden had a non-accidental pattern of injuries and that in his opinion, the injuries were inflicted intentionally or knowingly—knowing that the injuries were probably going to kill the child. He stated that a person stomping on Jorden's abdomen could have caused her small bowel to separate and that a person kicking Jorden in the head could have caused the four- to five-inch fracture. He further testified that he would not expect to see all the injuries that Jorden had from a simple fall.

#### e. Dana Huckabee, CPS

Dana Huckabee testified that she was an investigator with the CPS office in Gainesville in January 2000 and that between 2:30 and 3:00 p.m. on January 4, 2000, she received a call from a police detective requesting that she come to the emergency room. Once she arrived, the police and justice of the peace informed her that a child had died with suspicious injuries and that the death was unexplained. She saw Jorden and noted her bruising.

Huckabee stated that her primary role was to determine the safety of the two other children in the Saager home. Huckabee met with the Saager family later that afternoon. She noted that Yolanda was particularly upset and distressed, that Lloyd seemed shocked and was trying to console Yolanda, and that neither Yolanda nor Lloyd seemed to understand what had happened to Jorden.

---

**16.** The "apartment showing" referred to by Dr. Dolinak is the January 3, 2000 town home rental meeting at which Diane Rafear was present.

Yolanda told Huckabee that in September 1999 they started noticing Jorden's health problems, which consisted of petechiae on her hands, a cold, and an ear infection. Later, they noticed that Jorden had started bruising. Yolanda mentioned that she caught Jorden putting her fingers down her throat on occasion, but Jorden did not throw up.[17] Yolanda told Huckabee that Jorden would cry about going to Stevens's house and that she (Yolanda) felt like Jorden did not like to go there.[18]

Lloyd told Huckabee that sometimes he felt like maybe he played too rough with the children.[19] During her investigation, Huckabee determined that Yolanda and Lloyd had no history with and had never been investigated by CPS in Texas, Florida, Colorado, or anywhere else.

Huckabee conducted informal interviews with Branden and Alyssa, who were five and three years old, but did not obtain much information because of their young ages. Because Huckabee was more concerned about what was going on in their house, she did not ask Branden or Alyssa about what went on in their babysitter's home.

Although there was no indication that Branden and Alyssa had been abused in any way,[20] after a staff meeting with her supervisor, Huckabee decided to place Branden and Alyssa in foster care as a result of Jorden's unexplained death. When Huckabee told Yolanda and Lloyd that CPS was putting Branden and Alyssa in foster care pending Jorden's autopsy results, they responded appropriately and were supportive of the children. Branden and Alyssa stayed in foster care for at least nine months before they were returned to their parents.[21]

Huckabee talked to Stevens at her home on January 5, 2000. Stevens told Huckabee that she had started babysitting the Saager kids on December 3, 1999, and that she babysat Branden a few times during the Christmas break and on New Year's Eve. Stevens said that she had taken Jorden to the zoo with her on January 3, 2000, and that an African crane had pecked Jorden on the hand.

Stevens stated that Jorden had been sick frequently, that she bruised easily and frequently, and that she threw up every day. Stevens said that the Saagers had taken Jorden to Cook Children's Hospital and that the tests revealed that Jorden was fine. Huckabee noted that Stevens spent a lot of time telling her about Jor-

---

17. Stevens told Yolanda that Jorden was throwing up all the time, but neither Lloyd nor Yolanda saw any signs of that and thought Jorden was playing a game in which she faked vomiting to make her siblings laugh.

18. Yolanda testified that towards the end, Jorden said that she did not want to go to Stevens's house and that Stevens was mean. Yolanda noted in retrospect that Jorden's attitude began to deteriorate and that she was not as happy anymore after Stevens became her babysitter.

19. Lloyd admitted that he roughhoused with the children by having tickling wars with them, but he said that he was never violent

with them. He also did not roughhouse with Jorden during the period of time when she was bruising.

20. Dr. Respess evaluated both Branden and Alyssa and found no problems.

21. As noted above, the parents testified that they did not get their children back for fifteen months. The discrepancy between that number and the six-month period of foster care testified to by Huckabee may be attributed to the fact that Branden and Alyssa stayed with Yolanda's grandmother, rather than in a foster home, for an unspecified amount of time while they were in CPS custody. However, the record does not clearly explain this discrepancy.

den's vomiting, which led Huckabee to believe that Jorden was very sickly.

Stevens said that Yolanda told her that Jorden's lips and stomach were swollen the night before January 4, 2000. On the morning of January 4, 2000, Yolanda told Stevens that Jorden did not need to have citrus and that she could have toast. For lunch that day, Stevens said that she, Jorden, Alyssa, and Matthew went to Burger King. Jorden had a drink and tried to eat a french fry, but Stevens would not let her because of Yolanda's instructions.

When they returned to Stevens's home, Jorden took two or three steps and fell on her face. Stevens said that she was worried that the straw in Jorden's drink had gone down her throat, but Jorden got up on her own and appeared to be okay. Stevens put Jorden down for a nap; but she was restless, and Stevens could not keep a blanket on her. Jorden told her that she was cold. Stevens said that it looked like Jorden was looking through her and that at about 1:00 p.m., she decided to take Jorden to Dr. Gibbs's office.

Stevens stated that Jorden was awake when they arrived at Dr. Gibbs's office and that she carried her in, though she felt that Jorden could have walked on her own. She said that they went into an exam room and that the nurse tried to put an oxygen mask on Jorden, but Jorden was batting it away and saying, "No, no."

During Huckabee's interview with Stevens's children, Huckabee noted that there were things about them that seemed odd. She said that Taylor was a little reserved but seemed happy and that Mason was difficult to engage as he turned his rear end to her and looked through his legs.

Stevens's children denied getting into trouble at home and did not want to talk about it, which was a red flag for Huckabee.

Huckabee subsequently learned that Stevens had been untruthful, and CPS removed Stevens's children from her care on January 11, 2000, even though no evidence of physical abuse was discovered.[22] Huckabee testified that Stevens did not respond appropriately when she was asked to explain to her children what was happening; ultimately the police escorted Stevens away.

### f. Anthony Anderson, CPS

Anthony Anderson became involved with Stevens and the Saagers in March 2000 after Huckabee transferred to another CPS office. He stated that the purpose of his investigation was to determine the safety or risk that existed to the two sets of children who had been removed, Stevens's children and the Saagers' children. As part of his investigation, he interviewed Dr. Gibbs, nurse Cravens, and another nurse from the clinic and obtained statements from them.[23] He also did a great deal of research on the case before he contacted Stevens to arrange an interview with her. He said that the first time that he talked with Stevens on the phone, she said multiple things that he knew were false. He interviewed Stevens in person on March 23, 2000, at her attorney's office and was not permitted to record the interview, so he took notes and made a report.

At the in-person interview, Stevens told him that Jorden's condition on January 4, 2000, was nothing unusual other than a sour stomach and that Jorden did not complain of feeling poorly. Stevens said that Jorden threw up once because of her sour

---

22. Long bone scans performed on the Saager children and the Stevens children revealed no old injuries.

23. Anderson testified that prior to his taking statements from these individuals, they had not been talked to by law enforcement about the case.

stomach, so Stevens changed Jorden and washed her clothes. Anderson's notes indicate that Stevens told him that she had changed Jorden's diaper more than once because Jorden had more than one bowel movement during the day. Despite having changed Jorden's clothes and diapers—exposing Jorden's abdomen—when Anderson asked Stevens about Jorden's bloated stomach, Stevens stated that she had not seen any bloating or distention.

Stevens said that she took the children to eat at Burger King, but Jorden only ate a french fry. Jorden said that she wanted to go play with Alyssa, and thereafter Jorden played in the balls and slid down the slide. Stevens indicated that Jorden was walking around and moving normally. Stevens said that after about thirty to forty-five minutes at Burger King, Jorden had rubbed her eyes and acted tired, so Stevens took the children back to the house to take a nap. When they got home, Jorden fell flat on her face between the carport and the driveway. Stevens did not alter her story despite having seen Jorden's autopsy photos.

Anderson testified that he also interviewed the Saagers. He said that when he concluded his investigation, he recommended that the Saager children be reunited with their parents.

### g. Cindy Stormer, Ad Litem

Cindy Stormer testified that before she became the Cooke County District Attorney, she was in private practice and was appointed attorney ad litem for Stevens's children in the civil suit terminating Stevens's parental rights. Stormer interviewed Stevens's children—Taylor, Mason, and Matthew—and found that they were the most abnormally behaving children that she had ever interviewed. Stormer described the children as "very robot-like" and said that they appeared to be brainwashed because they kept repeating the same phrases over and over again as if they had been coached.

Stormer said that she took Stevens's deposition on June 6, 2000, and that it lasted most of the day. Stevens testified that she started caring for Yolanda's children on November 29, 1999, and that Jorden received a bruise on that first day because she fell out of a toy car. Stevens believed that Jorden was taken to Dr. Gibbs the day after she started babysitting her; however, the medical records indicated that Jorden was taken to Dr. Gibbs on November 17, 1999, not on November 30, 1999. Stevens said that Jorden reinjured her finger when Alyssa slammed it in a drawer; Stevens was evasive about how Jorden injured her finger the first time and why this was a reinjury.

Stevens admitted that sometimes Jorden did not want to come to her house and would hold onto her mother. Stevens also admitted that she had told someone that the Saagers had a history with CPS in Florida, and she said that she had obtained that information from Yolanda. Stevens said that she had told people that she was a pharmacy technician but denied saying that she was a pharmacist.

Stevens said that the only injury that Jorden had when she arrived at her house on the morning of January 4, 2000, was a contusion on the right side of her face, which Stevens thought Jorden had received by falling in the snow when she was on an out-of-state trip. Stevens stated that on January 4, 2000, Jorden threw up several times and that she had thrown up every day that she had babysat her. She admitted changing Jorden's clothes and washing them because they had vomit on them.

Stevens said that they went to Burger King and that Jorden played, walked around, and appeared to be healthy and

normal. Stevens said that she assisted Jorden with sliding by putting her at the top. Stevens said that at one point, Jorden was restless and sleepy, but she still acted normally. Stevens said that when they got back from Burger King and were walking into the house, Jorden fell on the concrete driveway but did not cry. Stevens said that event was her first cause for alarm.

Stevens said that she went straight to Dr. Gibbs's office from her home at about 1:00 p.m. Stevens admitted that she lived closer to the hospital than to Dr. Gibbs's office. Stevens also admitted leaving a note on January 4 on the back door for Yolanda but stated that the note said that they had gone to the doctor.[24] When asked why she took Jorden to the doctor instead of to the hospital, Stevens said that "it was not so serious that I thought she needed hospital care. I thought she needed to be seen by her doctor." Stevens admitted that no one else had access to Jorden between 7 a.m. when she was dropped off by Yolanda and the time that she died.

### h. Leslie Switzer, Social Worker

Leslie Switzer, a clinical social worker, counseled Stevens's children, Taylor and Mason, from May 2000 until January 2001. Initially, the children were very guarded and reserved and said that they could not talk about their previous home life or they would get in trouble with their mother. The children also mentioned that they had secrets that they could not talk about because they would get in trouble. Once the children were told that they did not have to see their mother anymore, they began to make progress in their therapy and began to reveal their secrets.

Switzer testified that the children's secrets had to do with a baby that had died. She said that in January 2001, the children talked about witnessing Stevens "stomp" on a child. During play therapy, Taylor would show scenarios where the mother would stomp on the baby and kick it in the head, and then Taylor would say that this is what she had seen her mother do. Switzer stated that Taylor demonstrated this with a doll. Switzer said that some of the other themes during play therapy involved a baby getting sick with a babysitter and then getting better and a mother hurting kids and a baby having to go to the hospital.

Mason talked about his mother's putting a child's fingers through a fence at the zoo and an animal biting the finger. In contrast, Switzer's progress notes state that in November 2000, Mason had volunteered that he did not have any secrets and that his mother was never aggressive or abusive to anyone.

### 4. The Testimony Of People Who Were Related To Or Knew Of The Saagers And The Stevenses

#### a. Jorden's Brother

Branden Saager, who was eleven at the time of trial, testified that he stayed with Stevens less often than his sisters. He went to the zoo with Stevens, watched her stick Jorden's finger in an ostrich cage, and saw Jorden get bitten by the ostrich, which made her cry.

Branden also recalled a time when Stevens grabbed Jorden, threw her on the bed, and shut the door. He heard a smack and then heard Jorden scream. He heard another smack and more screaming, so he went outside and hid behind the house. He did not tell his parents because he was scared.

---

**24.** As mentioned previously, the note retrieved by police from Stevens's door said that the children and Stevens were at the park.

### b. Jorden's Grandfather

Clyde Ward testified that when Yolanda and Lloyd were discharged from the military, he invited them to come live with him. Ward said that he enjoyed having three children in his home, that Jorden was a good baby who did not cry often, and that he only remembered her throwing up one time.

Ward did not hear Jorden screaming like she was hurt on the night before or on the day of her death. Ward said that he thought he had lunch downtown with friends on January 3, 2000, but that he was home by 5:00 or 6:00 p.m. He did not remember anything out of the ordinary taking place on January 3, 2000.

When he was asked about the day of Jorden's death, Ward stated that Yolanda had a habit of giving all three children a shower at the same time and that she always got Jorden out first because she would put her diaper on her, bring her to the kitchen, put her in the high chair, and get her started on breakfast. Ward recalled that on the morning of January 4, 2000, Jorden offered him a bite of her cereal and that he took it. Ward said that Jorden was wearing a diaper and that he did not see any bruises on her.

Ward spent the day in Dallas, and that evening, he received a call from his son informing him that Yolanda and Lloyd were at the police station. He went to talk to the police and was taken in a room with his son and questioned for about thirty minutes. Ward did not have any concerns that Yolanda and Lloyd might have been involved in Jorden's death; he told the police that if he thought that Yolanda or Lloyd were connected in any way to Jorden's death, he would have shot them with his .357.

### c. Stevens's Ex–Husband

John Stevens testified that he was married to Kim Stevens from 1993 to 1999. After their divorce, he lived in Grapevine, and Stevens lived in Gainesville. He said that he would spend his days off in Gainesville playing with his children and would even spend the night in an effort to keep an eye on them.

He said that he spent December 31, 1999 through January 1, 2000, ringing in the New Year at Stevens's house with his kids. He stated that when he arrived around 11:00 or 11:30 p.m., he learned that Stevens was babysitting the Saager kids and that all the kids were asleep. During that evening, Jorden kept going back and forth to the bathroom with Stevens; he was not sure if she was vomiting or coughing or if she had a stomach virus. He said that Lloyd came to pick up his kids around 3 or 4 a.m. and that he seemed intoxicated because he was speaking loudly. However, he noted that Lloyd seemed happy to see his kids and vice versa.

The next time that John came to Gainesville was when Stevens called and told him that Jorden had died. Stevens said that Jorden's father was in jail and that he was going to be released to attend the funeral, which John thought was a little unusual. Shortly thereafter, John realized that Stevens was the only person who had told him that and that he had seen Jorden's father, who was not in custody, at the courthouse during a CPS hearing.

John testified that Stevens told him that the Saagers had a history with CPS. However, John never saw any bruising on the Saager children, never witnessed Stevens abusing them, and never witnessed Stevens abusing his children. He admitted that Stevens verbally abused him and their children and that verbal abuse was "the norm," though he did not remember Stevens verbally abusing the Saager children.

#### d. Stevens's Children

Mason Stevens, who was ten years old at the time of the trial, testified that he had not seen "Kim" in a "very long time" and that made him happy. He remembered going to the zoo. He said that Kim told the little girl to put her finger in the ostrich cage, that she did so, and that the ostrich bit her. He stated that Kim told the little girl's mom that Jorden had put her finger in the cage, even though that was a lie.

Taylor Stevens, who was eleven at the time of the trial, testified that she was happy not to have seen her mother in a long time. Taylor said that she knows that Jorden was two and that she died.

Taylor said that while they were at the zoo in Gainesville, her mother stuck Jorden's hand in the ostrich cage and that the ostrich bit Jorden's finger. Taylor thought that seemed like a mean thing, and that it was not funny or a joke; it upset her.

Taylor also testified that she saw her mother step on Jorden's stomach on purpose while Jorden was watching television. Taylor said that she did not remember how Jorden reacted.

#### e. Robbie Manthei, Owner of Stevens's House

Robbie Manthei testified that she rented a house in Gainesville to Stevens and her three children. She said that Stevens told her that she was a pharmacist, but Robbie later learned that this was not true.

Robbie was not aware that Stevens was babysitting other children until she got a call from Stevens asking her to pick up Stevens's children from school because Stevens had to take a little girl that she was babysitting to the hospital. Robbie said that she picked up two of Stevens's children from school and that later that day she picked up Stevens's baby from Stevens.

Stevens eventually called Robbie and told her that the police were coming to look for toxins in Stevens's house and that she might want to come over. When Robbie arrived, Stevens was in the front yard and told her that the baby had died. Robbie had already heard that the baby was dead because she had sent her husband to the hospital to tell Stevens to come pick up her children, who were being unruly. Her husband had told her that he had seen Stevens in a police car at the hospital.

Stevens told Robbie that the baby had been sexually abused. Specifically, Stevens said that hospital personnel had told her that Jorden had a concussion and a ruptured spleen, rectum, and vagina. Stevens said that the dad or the grandfather had possibly committed the abuse with his penis or a broomstick. Stevens asked Robbie to call her mother and not her husband because she did not want her children taken away from her. Stevens also told Robbie that Jorden's dad had hurt his son and that CPS had removed the little boy.

Stevens said that she had taken Jorden to McDonald's that afternoon, that Jorden had fallen down, hit her head, and cut her lip. Stevens said that after they returned to Stevens's house, Jorden became sicker, so she took Jorden to the doctor's office. Stevens said that Jorden had walked into the office and that Stevens had carried her own daughter in.

After Jorden's death, Stevens called Robbie twenty to thirty times and asked if she knew what was going on and told her that Jorden's family had asked her to come pick out clothes for Jorden's funeral. Robbie testified that she does not know the Saagers.

### 5. The Facts Concerning Stevens's Defense That Jorden's Parents Committed The Offense[25]

#### a. Dr. Roberto Bayardo

Dr. Roberto Bayardo, the Chief Medical Examiner for Travis County for twenty-seven years, testified that he was appointed by the court as an expert for Stevens and that he normally testifies for the State. He said that he was able to form a more precise estimate as to when Jorden suffered the abdominal injury and skull fracture because he had more information than the Dallas County Medical Examiner had available to him.[26]

Dr. Bayardo testified that it was his opinion that the injury that caused Jorden's skull fracture and the injury that caused her duodenum to split occurred at the same time and that he believes those injuries were inflicted the evening before Jorden died. He said that the duodenum transection was a clean cut injury with no evidence of hanging tissues; thus, there was no indication that Jorden's duodenum was hanging on by a thread and later ruptured. Instead, he believes that the duodenum's complete transection occurred at the time of the injury.

He said that Jorden's skull fracture did not happen on the day Jorden died. He based this opinion on a photo of this injury that showed blood in the bone; he said that if Jorden's skull injury had occurred on the day that she died, then there "would have been more fluid, [or it] would have easily washed out, [or] broke[n] away."

Dr. Bayardo testified that a severed duodenum is a tremendous injury, requiring a tremendous amount of force, and that it would require more force than a stomp on the abdomen. He said that he would expect a lot of crying at the time of the injury and that it would be hard to hide that kind of injury in a house of three adults. He explained that the bowel would shut down several hours after the injury and that he assumed that this case was an exception to that rule because Jorden had at least two bowel movements on the day of her death. Based on the microscopic sections of Jorden's intestines and the photos, he believed that the injury had occurred eighteen to twenty-four hours before Jorden died.[27] He said that he would not expect Jorden to be acting normally twelve to eighteen hours after this injury was inflicted, but he said that children are resilient and their responses to injuries are not predictable.

He told the jury that the photo of Jorden's anus showed that it was very dilated and did not appear normal. He said that there were changes on the surrounding skin that should not have been there. He explained that this type of dilation is caused by something penetrating the rectum many times and for a prolonged period of time. He said that the vaginal opening should be closed by its hymen and that

**25.** Although some of the testimony set forth below may appear to be irrelevant, we include it nonetheless because Stevens claims in a separate point that she was prohibited from presenting a defense.

**26.** He said that he reviewed the autopsy report and attendant diagrams, autopsy photos, recuts of the tissue slides, the investigative report from the medical examiner, records from Gainesville Memorial Hospital from January 4, 2000, Dr. Dolinak's notes, the hematology and oncology report from Cook Children's Hospital, and the indictment. He said that he had not been provided the police officers' reports, witness statements, Stevens's statements, records from Jorden's primary care physician, or information on what Stevens's children or Jorden's siblings had witnessed.

**27.** However, he admitted that the iron stain for the duodenal injury was negative.

in Jorden's case, her hymen is "kind of shortened, thickened, and appears dilated," which could be a normal finding but in his view was quite suspicious and needed to be investigated for any history of vaginal penetration. During cross-examination, Dr. Bayardo admitted that Jorden's hymen was intact and that he was aware of literature indicating that a thickening of the hymen is normal. Dr. Bayardo concluded in his report that Jorden had been the victim of chronic sexual abuse.

Later in his testimony, Dr. Bayardo testified that there was only one explanation for a very dilated, very abnormal anus like Jorden's—the probability that the child had been sexually abused. In his opinion, Jorden's anus had scarring because of the dilation, but he did not include this finding or opinion in his report. Dr. Bayardo admitted, however, that the medical literature—which he admitted that he had not seen before—indicated scarring is a more important factor for a determination of sexual abuse than dilation. He stated that he was not aware of how a medical professional should review a finding of anal dilation until the prosecutor showed him the medical authorities. He agreed that the medical literature says that a medical professional should be very cautious of equating anal dilation with sexual abuse because anal dilation may occur for many reasons. Until he was shown the medical literature, he was not aware that a correlation exists between a duodenal injury and anal dilation. He was aware of literature that anal dilation is not by itself an indicator of sexual abuse, but he would not change his handling of the case. He agreed that one of the books that he relied on said that anal changes could be postmortem anal dilation, which could be mistaken for sexual abuse, and that 4.7% of 171 children referred for gastrointestinal complaints revealed anal or perianal abnormalities. He admitted that he would not expect parents to regularly take their children to the doctor if they were abusing them.

#### b. Dr. Michael Flynn

Dr. Michael Flynn, a clinical psychologist, testified that he interviewed Stevens and did some psychological testing on her in jail and that he reviewed the play therapy that Switzer had performed with Taylor and Mason. He testified that memory is not a reliable measure of actual events because people's memories of events can be manipulated depending on how they are questioned. He opined that all play therapy encourages children to make up things to try to please the counselor and that inside-oriented play therapy raises the rate of false memories to 50%. He agreed however that Taylor's memory of her mother's stomping on Jorden's stomach was consistent with the injuries found after the assault, and that Switzer had possessed no knowledge of how Jorden's injury had occurred until Taylor told her.

Dr. Flynn testified that Switzer's reports indicated that she was going to keep coming back and picking at the children's secrets until she found out what they were. He noted that once Switzer got the allegation, she dropped the children and quit their therapy at the time when he believed that therapy should have just been beginning. He pointed out that there was no evidence that Switzer considered any diagnosis other than post-traumatic stress disorder. He said that the children's symptoms noted by Switzer were symptoms of nearly everything—anxiety disorders, depression, oppositional defiant disorder, ADHD, and post-traumatic stress disorder.

#### c. Constance Miller, Zoo Keeper

Constance Miller, who was a zoo keeper at the Frank Buck Zoo in Gainesville in January 2000, testified that she assisted in treating the bite on Jorden's finger from

the African Crowned Crane. She said that two women were with the child and that the smaller woman appeared to be in charge.[28] Miller testified that the smaller woman was acting overly emotional and was on the verge of hysterics, which was a gross overreaction. Miller stated that the smaller woman was belligerent and rude. With regard to the child, Miller said that she did not look scared but instead was very quiet and solemn with sad eyes.

#### d. Dana Huckabee, CPS Caseworker

Huckabee testified that she remembered Lloyd saying that Jorden was their weird child because she did not look like their immediate family and that there was a family joke about it.[29] She also remembered his saying that Jorden looked like his sister. Huckabee testified that she did not take Lloyd's statement as anything negative because he said it at the hospital shortly after they found out that Jorden had died.

Huckabee recalled that Taylor said on tape that they did not ever get in trouble at home and that her older sister Jillian was not going to live with them because her mother kept getting so mad.

#### e. Jillian Evans, Stevens's Daughter

Jillian Evans is Stevens's eldest daughter who was twenty-one years old at the time of the trial and who lived with Stevens from November to December 1999. She testified that she did not ever see her mother abuse the Saager children in any way, that she did not see any bruising on them, and that her mother appeared to take "pretty good care" of the Saager children and of her own children. Evans stated that she never saw her mother take

Jorden into a room and close the door. She said that the Saager children came over without their hair brushed, that she saw food in Jorden's hair, and that Yolanda was always trying to get her mother to babysit. She testified that Jorden threw up frequently and that she ate her own vomit. Evans admitted that her mother locked her out of the house at one point for a few minutes after an argument about smoking, and her father drove to Gainesville to pick her up.

#### f. Sandra Walker, Neighbor

Sandra Walker testified that she lived near the Saagers and that she had heard a noise during the late hours on January 1, 2000. She said that she saw a figure banging on the doors or the windows of 1311 Magnolia—Ward's house—and that the figure wanted to get in or to get somebody out. She said that she did not call the police.

#### g. Robert Harden, Security Consultant

Robert Harden testified that he came to Gainesville on January 5, 2000, to conduct an extensive interview with Yolanda. During the interview, which took place the evening after Jorden had died, Yolanda told Harden that in November 1999, she had picked up Jorden from Stevens's house and that she "looked like she'd gotten the hell beat out of her"; so Yolanda took Jorden to Dr. Gibbs immediately thereafter. Yolanda told Harden that prior to November 1999, she had never seen bruises on Jorden and thought that Jorden was developing a medical problem.

Harden asked Yolanda if her husband could have done the physical damage to Jorden and if he was actually alone with

---

28.  The record indicates that Stevens was referred to as the smaller woman.

29.  Lloyd testified that they joked a lot in their family and that they used to call Jorden by the nickname "little ugly duckling."

the children long enough to do it, and she said, "Yes." However, throughout the intensive interrogation that lasted three to four hours, Yolanda never wavered in her opinion that her husband had not hurt Jorden. Yolanda repeatedly explained that she would not protect Lloyd if he had hurt Jorden.

Harden testified that throughout the interview, Yolanda alternated between extremely emotional and suddenly very normal. He also commented that although Yolanda had described herself as naïve or very trusting, he did not think that she appeared that way.

### 6. State's Rebuttal

#### a. Robbie Manthei, Owner of Stevens's House

During rebuttal, Robbie testified about Stevens's children's extremely unruly behavior while they were at her house. Robbie said that Stevens's children threw potpourri all over the house, they chewed up crackers and spit them out, and they raised up her shirt and called her a bitch. Robbie testified that when she tried to correct them, the little girl would pick up the sofa cushions, put them on top of the little boy, lie on them, and say, "Don't hit me." Robbie said that the children cowered, acted scared and petrified, and would run and hide each time she and her husband tried to correct them. When Mason licked a table in Robbie's house, Robbie's dad told him that he was going to jerk his ears off, and the little boy went crazy.

Robbie noticed that the little boy had a very big red mark about two to three inches long on the back of his neck that looked like a curling iron or rope burn. Robbie said that her brother, who is an EMT, saw the mark and said that it looked like rope and that it was big and raw. The children said that they did not know how it happened, and Stevens said that she did not notice it, which Robbie thought was odd because "you [would] have to notice it." The little boy also had a mark on his forehead that looked like a rug burn, but the children did not remember how that injury happened. Robbie admitted that the children had never been in her care before but said that they had seen her before.

#### b. Ken Manthei, Owner of Stevens's House

Robbie's husband Ken testified that he understood that Stevens was a licensed pharmacist.[30] He said that on January 4, 2000, he was working in the yard when he noticed some children at his house that he did not recognize. He learned that they were Stevens's children. He stated that his wife came outside and got him several times, asking him to try to restore order inside the house. He went inside the first time and told the children that there needed to be more order, and the second time when he went inside, the little girl begged him not to hit her brother, who was hidden underneath some couch cushions. Ken testified that the little girl's begging made him think that the children had been "whaled upon" at some point. When his wife came out a third time to get his assistance with getting the children to behave, he decided to go to the hospital to get Stevens; he did not feel it was his job to keep children that were acting so badly.

When he arrived at the hospital, he saw Stevens in a police car, and she told him that the child she had been babysitting had died. He realized that Stevens had bigger problems than he did and decided that he

---

30. During cross-examination, he saw that Stevens's rental application stated her occupation as self-employed pet care provider and full-time homemaker and that another document said that she was an EMT and medical aide.

and Robbie would keep Stevens's children a little longer.

### c. Gordon Saager, Lloyd's Father

Gordon Saager, Lloyd's father, testified that when Jorden was at his house at Christmas, she was doing very well and was very happy. However, he said that Jorden may have slipped on the ice and reinjured her finger while she was at his house.

When Lloyd called him on January 4, 2000 to tell him that something was wrong with one of the girls, Lloyd did not know which daughter was hurt. Gordon testified that he got on a flight from Indianapolis within an hour and a half of Lloyd's phone call.

When he arrived, he and the rest of Yolanda's family made the decision that Lloyd should hire an attorney. They hired an attorney while Lloyd was in the interrogation room.

Gordon talked to Stevens at some point on January 4, 2000. She told him that she had taken the children to Burger King that day and that upon returning home, Jorden tripped and fell on the sidewalk leading to her house. Once inside, Jorden seemed tired, so Stevens said that she put her down for a nap. Jorden became very restless and would not go to sleep. Stevens said that after a little while, she went to Jorden, sat her up, held her, and rubbed her back to settle her down. He remembered Stevens telling him that Jorden was not acting normally, that her eyes did not seem to be focusing, and that she seemed to be looking right through Stevens.

At that point, Stevens told him that she began to think that something might be wrong, though she did not think it was terribly serious. Stevens told him that she debated whether to take Jorden to the doctor because she did not think that it was necessary at that point. Stevens told him that because Yolanda was due to pick up Jorden in about an hour and a half, Stevens thought that maybe she should let Yolanda take Jorden to the doctor if Yolanda thought it was necessary. Stevens finally decided that if the doctor was not busy and could see Jorden right away, she would take her; if he was busy, she planned to take Jorden home and let Yolanda take her to the doctor.

Stevens told Gordon that she carried Jorden into the doctor's office and asked if they could see her. Stevens said that she was told that the doctor could see Jorden, so Stevens went outside to get the other children. Stevens told Gordon that when she returned, the nurses were trying to give Jorden oxygen, and Jorden was fighting them. Stevens told him that the nurses called an ambulance and took Jorden to the hospital.

### d. Dr. Joseph Guileyardo, Medical Examiner

Dr. Joseph Guileyardo was consulted in this case to give a time frame for when Jorden's injuries occurred. He testified that he had signed off on the autopsy performed by Dr. Dolinak on Jorden. He stated that he had reviewed the autopsy report; the investigative report from the medical examiner; all the autopsy photos; the police reports; the police department's investigative file, including witness statements; the medical records; and opinions from other experts and that he had ordered another set of microscopic slides.

Dr. Guileyardo testified that he believes Jorden's skull fracture was inflicted very shortly before her death because there was no injury to the brain itself and because the microscopic analysis showed only very early acute inflammation at the site of the skull fracture. He said that some of the iron stains from Jorden's head injuries

tested positive, meaning that blood had been there for a couple of days, but he said that all of Jorden's head injuries were more recent than a couple of days. He said that if there were no bruises on Jorden when she was dropped off at the baby-sitter's house, then "obviously there was some head trauma after the child was dropped off"; thus, he believes that the skull fracture occurred on the day of Jorden's death. He told the jury that there was only one injury on Jorden's face that would be consistent with a fall; a fall could not explain Jorden's other bruises.

Dr. Guileyardo testified that there was no objective evidence that Jorden was sexually abused. He did not see any abnormalities indicating sexual abuse. He testified that scientific literature has documented that anal dilation occurs in children who have suffered intestinal injuries.

Dr. Guileyardo's opinion with regard to the injury to Jorden's duodenum is that a child who has had her intestines totally transected—including the blood vessels, causing a large amount of bleeding—would look very sick, would be very symptomatic, and would die very quickly after this devastating injury. He does not believe that Jorden could have functioned in a seemingly normal fashion for fourteen to thirty hours while suffering from a completely transected duodenum. The argument that Jorden suffered a complete transection of the duodenum the evening before her death does not make sense to him because he would not expect Jorden to look fairly normal on the morning of her death.

Dr. Guileyardo attempted to explain the apparent inconsistencies between the timing of Jorden's duodenum injury and Jorden's physical appearance and activities.

He explained that there was a severe inflammation all over the inside of Jorden's belly and that such swelling takes a significant amount of time to develop. Consequently, an argument could be made that the severe duodenum injury must have happened after Jorden was playing on the town home staircase in Plano because she would not have been able to play on the staircase with this kind of severe injury. He noted, however, that the people making this argument (Stevens) also asserted that Jorden was capable of playing at Burger King the next day at lunch; he cannot reconcile these two timing-of-injury arguments. In other words, if Jorden experienced a total duodenum transection the evening of January 3 after returning from the Plano town home, she would not have been physically capable of playing at Burger King the following day at lunch. Therefore, he believes that initially there was a small perforation of Jordan's intestine that allowed bacteria to leak out into Jorden's belly and set up the infection over hours and hours, and then there was a second set of injuries, which actually tore the intestines totally apart; otherwise, there is no way to reconcile the two separate issues.[31] Consequently, he believes that the initial injury occurred several hours up to a day or so before Jorden's death.

Dr. Guileyardo stated that Jorden's injury was not an accidental injury because the duodenum cannot accidentally be severed, there were injuries on more than one part of her body, and the injuries were not all in the same direction. He said that there is no accident involving a single fall that would result in all these different angles and injuries unless the child was rolled over by a car. In this case, he

31. Dr. Guileyardo admitted that there was no evidence in the picture of the bowel to indicate that it had received an earlier rupture causing a leak and that there was a later split.

He said that an actual transection could explain the build-up of fibrinopurulous material, but then, in his opinion, Jorden would not have survived as long as she did.

testified that the injury could have been inflicted with a foot or a hand.

Dr. Guileyardo believes that the transection occurred after Jorden was dropped off at Stevens's house, that it happened within a very few hours before she died, and that there was a significant injury prior to that. He believes that Jorden's abdomen was infected the night before she died due to the amount of inflammation in her abdomen and the fact that it would have taken several hours up to a day or so for that to form. There was evidence that Jorden was cold the night before her death, and Dr. Guileyardo testified that if she was hemorrhaging or losing blood, she could feel cold. He said that if he assumed that Jorden looked sick on the staircase in Plano, that would fit with what he saw in Jorden's belly, that is, severe and acute inflammation. He said that Jorden's stomachache, bloating, and chills are symptoms consistent with a bowel perforation that had occurred the day before her death and had caused an infection in her abdomen. Thus, he testified that, in his opinion, the fatal injury occurred after Jorden was at Burger King and that she would have gone into shock within minutes.

## C. Analysis of the Evidence[32]

### 1. The Court's Charge

In this case, the jury was charged as follows:

Now, if you find from the evidence beyond a reasonable doubt that on or about January 4, 2000, in Cooke County, Texas, the defendant, Kim Stevens, did knowingly cause the death of Jorden Saager by (1) striking or squeezing Jorden Saager with the Defendant's hand, or (2) striking Jorden Saager with the Defendant's foot, or by (3) striking Jor-

den Saager with or against a blunt object, the exact nature of which is unknown to the Grand Jurors, and you further find beyond a reasonable doubt that Jorden Saager was an individual under six years of age, then you will find the defendant guilty of capital murder.

### 2. Evidence Supporting Jury's Finding of Guilt

█ We first consider the evidence that supports the jury's verdict.

#### a. Credibility Issues

On the day of Jorden's death, Stevens showed a lack of emotion, in stark contrast to the overwhelming sorrow shown by both Yolanda and Lloyd. On that same day, Stevens—a pharmacy technician, not the licensed pharmacist that she had portrayed herself to be—told people that Jorden had died of a concussion and ruptured spleen, even though Jorden's cause of death had not yet been established by the medical professionals who had treated Jorden. After Jorden's death, Stevens told numerous people that Jorden was always sick and vomiting and that the Saagers had been previously investigated by CPS, which the jury could infer was an effort to shift suspicion to the Saagers. Also, Stevens left a note for Yolanda saying that she had taken the children to the park, when in fact she had taken Jorden to Dr. Gibbs's office. Again, this evidence supports an inference that Stevens was covering up Jorden's injury. Stevens provided different versions of the events to different people regarding exactly where Jorden had fallen and at what point Stevens had taken Jorden to the doctor.

The jury also heard evidence that Stevens's ex-husband visited his children fre-

---

32. The fact-finder could draw some inference from virtually every witness presented by both sides in this case. We focus our analysis on the most key credibility and time-of-injury issues.

quently to keep an eye on them in light of Stevens's tendency to emotionally abuse them. Moreover, Stevens's son Mason had what appeared to be unexplained burns on his head and neck on the day of Jorden's death, and both Mason and Taylor behaved oddly at the Mantheis' house that evening, begging adults not to hit them as part of any reprimand. The ad litem and Switzer also testified that Stevens's children behaved oddly during their interviews with them. Stevens told Robbie Manthei that she did not want CPS to take her children; when CPS did take them, the CPS worker testified that Stevens acted inappropriately. Despite Stevens's having told Robbie about Jorden's death, Stevens proceeded to call Robbie thirty to forty times after Jorden's death seeking news about the Saagers, whom Robbie did not personally know.

#### b. Time–of–Injury Issues

The evidence demonstrated that Jorden started bruising after Stevens began babysitting her and that Jordan's bruising ceased while she was in Indiana with family at Christmas; this evidence could indicate that Stevens was the cause of Jorden's bruising. Medical experts ruled out an undiagnosed blood disease or an accidental injury as a cause of Jorden's death. The evidence established that Lloyd and Ward were never alone with Jorden, that the screaming and crying that would accompany a blow forceful enough to transect a duodenum could not have been hidden in a house with three adults, and that when Lloyd was called to the hospital, he did not know which of his daughters was in the emergency room.

Additionally, Stevens's description of Jorden's fall did not explain the various injuries that Jorden had over numerous parts of her body, especially the fairly recent skull fracture that was four to five inches long on the *back* left part of Jor-

den's skull. Also, one of the medical experts testified that due to the minimal inflammation around Jorden's skull, her death must have occurred shortly after the skull injury was inflicted, which would point to Stevens as the perpetrator of that injury.

With regard to the duodenum injury, the discoloration around Jorden's eyes and mouth that was obvious in her physical appearance while at the town home in Plano on the afternoon of January 3 would also seem to indicate that, despite Jorden's active behavior, Stevens had inflicted at least an initial injury to Jorden's abdomen before Yolanda had picked up Jorden that day. Stevens's stories that Jorden became restless and sleepy at Burger King, that she was cold during her nap, and that she looked dazed after leaving Burger King fit with the medical testimony that these symptoms would be present shortly after the complete transection of the duodenum had occurred, and testimony revealed that Stevens had sole possession of Jorden from approximately 7:30 that morning until her death that afternoon.

Moreover, Stevens's children testified that they saw their mother "stomp on" Jorden, and this testimony correlated with medical testimony that Jorden's duodenum had been transected and that some of the markings on Jorden's stomach resembled a heel print. Ultimately, Dr. Guileyardo testified that the fatal injury occurred after Jorden was at Burger King, which pinpointed Stevens as the person who inflicted Jorden's fatal injury.

#### 3. Evidence Weighing Against Jury's Finding of Guilt

We next consider the evidence that Stevens claims supports her factual sufficiency challenge—that the jury was forced to choose between Stevens and Jorden's parents as the perpetrators because there was

no eyewitness testimony, no confession, no fingerprints, no DNA, no blood stains, no motive, and no evidence of prior acts of violence by Stevens against Jorden.

### a. Credibility Issues

Stevens's daughter Jillian and Stevens's ex-husband both testified that they had never seen Stevens physically abuse the Saager children. Jillian further testified that the Saagers often called upon her mother to babysit their children and that they arrived at Stevens's house looking disheveled, thus implying that the Saagers did not take good care of their children. The evidence also revealed that Lloyd and Yolanda had fought the evening of New Year's Eve, but there was no evidence indicating that they were still feuding on the day of Jorden's death or that Lloyd would have taken out his frustration with Yolanda on Jorden.

Some of Stevens's evidence honed in on the possibility that Jorden had been sexually abused, which Stevens argues weighs against her guilt because she is a female and could not have sexually assaulted Jorden; however, the bulk of the medical experts concluded that Jorden had not been sexually abused. Additionally, although Lloyd's dad hired an attorney for Lloyd and Yolanda testified that Lloyd was physically capable of hurting Jorden, Yolanda and Ward both testified repeatedly that they did not have any reason to suspect that Lloyd had caused Jorden's death, and Lloyd himself testified that he played no role in Jorden's death.

Furthermore, Stevens elicited testimony from a clinical psychologist that her children's memories were not accurate and that their therapy had created false memories. But the jury was free to draw its own conclusions for why Stevens's children testified at trial consistent with their prior stories about Stevens's stomping on Jorden and for why Stevens's own children

testified that they were happy that they had not seen Stevens in a long time. *See generally Jones v. State,* 984 S.W.2d 254, 257 (Tex.Crim.App.1998) (stating that jury, as sole judge of credibility of witnesses, is free to believe or disbelieve all or any part of witness's testimony).

### b. Time–of–Injury Issues

Dr. Dolinak, the medical examiner, and Dr. Bayardo, Stevens's medical expert, both opined that Jorden's fatal injury occurred the evening before her death. They both based this conclusion on evidence that Jorden was running up and down the stairs at the Plano town home on the afternoon of January 3, that she began complaining of an upset stomach and being cold that evening, and that she had a decreased appetite on the following morning. They also noted that some of Jorden's bruises were at least forty-eight hours old. Moreover, they both believed that the complete transection of Jorden's duodenum occurred all at once because the injury appeared to be clean, with no evidence of hanging tissues. Because the fibrinopurulent matter they saw in the abdominal cavity takes twenty-four hours to form, they opined that the transection had to have occurred at least twenty-four hours before Jorden's death. Stevens's medical expert also saw some evidence of blood in the skull bone, which led him to believe that Jorden's head injury did not occur on the date of her death. All of this medical testimony opened the door for the jury to consider others in Jorden's home as the possible perpetrator of her life-threatening injuries, but this same medical evidence was highly contested by the State's rebuttal medical expert who testified that Jorden could not have functioned at the level she did on the day of her death—sliding, throwing balls, playing with children—if she had already received the fatal duodenum-transection injury.

Viewing all the evidence in a neutral light, favoring neither party, and giving due deference to the fact-finder's determinations, "particularly those determinations concerning the weight and credibility of the evidence," we hold that the proof of Stevens's guilt "is [not] so obviously weak as to undermine confidence in the jury's determination," nor is it "greatly outweighed by contrary proof." *See Watson,* 204 S.W.3d at 414; *Drichas,* 175 S.W.3d at 799; *Johnson,* 23 S.W.3d at 9, 11; *see also Couchman v. State,* 3 S.W.3d 155, 164 (Tex.App.-Fort Worth 1999, pet. ref'd) (stating that appellant's different versions of events is evidence of his consciousness of guilt, and jury could have reasonably concluded that appellant changed his stories because he had something to hide). We therefore hold that the evidence is factually sufficient to support Stevens's conviction for capital murder. *See Martinez v. State,* No. 04-01-00310-CR, 2002 WL 31760936, at *2 (Tex.App.-San Antonio Dec. 11, 2002, pet. ref'd) (mem.op.) (not designated for publication) (holding that there was factually sufficient evidence to support jury verdict convicting defendant of capital murder of two-year-old child whom he was left alone with). We overrule Stevens's fourth point.

## IV. TESTIMONY OF ADULT WITNESS BY TWO-WAY CLOSED-CIRCUIT TELEVISION DID NOT VIOLATE CONFRONTATION CLAUSE

■ As mentioned above, Clyde Ward was Jorden's grandfather. At the time of the trial, he was seventy-five years old; was living in Castle Rock, Colorado; and was suffering from heart problems. Ward's cardiologist wrote a letter to the trial court explaining that during the year preceding the trial, Ward had been evaluated and hospitalized multiple times for decompensated congestive heart failure, gastrointestinal bleeding, atrial fibrillation, and vascular disease. The doctor stated that Ward's health status was "actually quite tenuous," that he had a history of coronary artery disease, that he had undergone bypass surgery, and that he was at high risk due to his atrial fibrillation and other comorbidities. The doctor was very concerned that if Ward were required to testify in such an intense and stressful trial, the experience would have negative ramifications on Ward's health. She explained that, in her professional opinion, "Mr. Ward could very well suffer from a health standpoint." She requested that, if at all possible, he be excused for health reasons from participating in the trial.

Thereafter, the State proposed that Ward be allowed to testify via closed circuit television. Ward's cardiologist wrote a second letter stating that she was comfortable, from a health-risk standpoint, with Ward providing testimony via closed circuit television from the county where she was treating him.

During the trial, the trial court heard argument regarding the "State's Motion to Allow Witness Examination Through Closed Circuit Television" and ultimately granted the State's motion to present Ward's testimony via closed circuit television. Prior to Ward's testimony, the State requested that the record reflect the following details concerning the physical setup of the closed-circuit equipment being used to obtain Mr. Ward's testimony:

[W]e have set up a system wherein there's a podium in the middle of the courtroom from which the attorneys can question the witness. There's a laptop computer set up that will allow [Stevens] and the defense attorney to view the witness as well as a probably 20-some-odd-inch television screen that will allow them to view the witness as well and the jury can view the witness. And the feed allows the witness, based upon the way it's set up, to be able to see the person

questioning him as well as the Defense counsel table. And the person questioning him is not blocking or impeding the witness's view of the counsel table where the Defense attorney Counsel and the Defense Attorney's assistant can be seen.

And so that should allow for contemporaneous transmission and contemporaneous cross-examination and should allow the Defendant to be able to see the witness and the witness to be able to see the Defendant and the jury to be able to see the cross-examination and the witness contemporaneous with it taking place.

In her first point, Stevens contends that the trial court erred by allowing Ward to testify by video remote. The State responds that in light of Ward's tenuous health status and the technology used by the State to ensure that Stevens's right of confrontation was scrupulously honored, the trial court did not abuse its discretion by permitting the use of closed-circuit television.

The Sixth Amendment provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. This right to confrontation was made applicable to the states by the Due Process Clause of the Fourteenth Amendment. *Pointer v. Texas,* 380 U.S. 400, 403, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965). "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig,* 497 U.S. 836, 845, 110 S.Ct. 3157, 3163, 111 L.Ed.2d 666 (1990). The Confrontation Clause reflects a preference for face-to-face confrontation at trial, but that prefer-

ence must occasionally give way to considerations of public policy and the necessities of the case. *Id.* at 849, 110 S.Ct. at 3165. The salutary effects of face-to-face confrontation include (1) the giving of testimony under oath, (2) the opportunity for cross-examination, (3) the ability of the fact-finder to observe demeanor evidence, and (4) the reduced risk that a witness will wrongfully implicate an innocent defendant when testifying in his presence. *See id.* at 845–46, 110 S.Ct. at 3163–64.

The two-way closed circuit television procedure utilized by the State to present Ward's testimony preserved all of these characteristics of in-court testimony: Ward was sworn; he was subject to full cross-examination; he testified in full view of the jury, trial court, and defense counsel; and he gave this testimony under the eye of Stevens herself. Here, Ward's tenuous health situation—documented by letters from his treating cardiologist—was an exceptional circumstance that warranted permitting his testimony by two-way closed circuit television. *See United States v. Gigante,* 166 F.3d 75, 81–82 (2nd Cir.1999) (holding that upon a finding of exceptional circumstances, such as when a witness has a fatal illness and is part of the Federal Witness Protection Program, a trial court may allow a witness to testify via two-way closed circuit television when this furthers the interest of justice), *cert. denied,* 528 U.S. 1114, 120 S.Ct. 931, 145 L.Ed.2d 811 (2000). And the set-up that the State employed did not deprive Stevens of her Sixth Amendment right to confront Ward. *See generally Marx v. State,* 987 S.W.2d 577, 580 (Tex.Crim.App.) (holding that trial court's admission of two-way closed circuit television testimony from two child witnesses did not violate Sixth Amendment), *cert. denied,* 528 U.S. 1034, 120 S.Ct. 574, 145 L.Ed.2d 436 (1999).

Therefore, we hold that the trial court did not abuse its discretion by allowing Ward to testify via two-way closed circuit television. We overrule Stevens's first point.

## V. ERRONEOUS ADMISSION OF SOCIAL WORKER'S TESTIMONY

In her second point, Stevens argues that the trial court erred by allowing social worker Leslie Switzer to testify about statements made to her that did not fall within the medical-diagnosis-or-treatment exception to the hearsay rule. Switzer testified that during therapy Stevens's daughter Taylor told her that she had seen her mother stomp on the baby and kick her in the head. Stevens contends that because Taylor was approximately six years old when she made this statement to Switzer, Taylor was too young to understand the need to be truthful to Switzer, the healthcare professional who was providing a medical diagnosis or treatment.[33]

Rule 803(4) provides for the following to be admitted into evidence as an exception to the hearsay rule: "Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." TEX.R. EVID. 803(4). This hearsay exception is premised on the assumption that a patient understands the importance of being truthful with medical personnel involved in his care so as to insure a proper medical diagnosis and treatment. *Beheler v. State*, 3 S.W.3d 182, 188 (Tex.App.-Fort Worth 1999, pet. ref'd). The two-part test for admitting hearsay statements under the medical-diagnosis-or-treatment exception set forth in rule 803(4) is (1) the declarant must make the statements for the purpose of receiving medical treatment, and (2) the content of the statement must be such that it is reasonably relied on by a health care professional in treatment or diagnosis. *See Jones v. State*, 92 S.W.3d 619, 623 (Tex.App.-Austin 2002, no pet.).

In *Beheler*, this court held that

[w]here very young children are responsible for relating information to their healthcare provider, the presumption of reliability that forms the basis for this exception may break down if they do not understand the importance of being truthful. Nevertheless, there is no requirement that a witness expressly state that the hearsay declarant recognized the need to be truthful in her statements for the medical treatment exception to apply. Instead, the reviewing court must look to the record to see if it supports a conclusion that the young child understood why she needed to be honest when speaking to the caregiver.

3 S.W.3d at 188–89. Thus, when the medical-diagnosis-or-treatment hearsay exception applies to statements by very young children, the first prong of the admissibility test—that the declarant must make the statements for the purpose of receiving medical treatment—may be satisfied by a showing that the young child recognized

---

33. Stevens also claims that Switzer's testimony concerning this statement by Taylor was inadmissible because Switzer was not a doctor or a nurse, but was a licensed clinical social worker and because the statement was not made for the purposes of medical diagnosis or treatment. But, because we hold that the trial court abused its discretion by admitting this statement in the absence of evidence that six-year-old Taylor understood the need to be truthful with Switzer, we need not address the other grounds upon which Stevens challenged the admissibility of Switzer's testimony concerning Taylor's statement. *See* TEX. R.APP. P. 47.1.

the need to be truthful in her statements to her caregiver. *See id.*

The record before us is devoid of any evidence that Taylor understood why she was in therapy or that she needed to be truthful in her statements to Switzer. Neither Taylor's father nor Switzer indicated that they had discussed with Taylor the purpose of her therapy or the need to be truthful; in fact, Switzer testified that she does not stress truth as an issue but instead stresses safety because she works under the assumption that what children tell her is the truth. *See Powell v. State*, 88 S.W.3d 794, 800 (Tex. App.-El Paso 2002, pet. stricken) (holding that it was abuse of discretion to admit statements three year old made to therapist in absence of indicia of reliability). Thus, we hold that the trial court abused its discretion and acted outside the zone of reasonable disagreement by admitting Taylor's hearsay statement to Switzer as within the medical-diagnosis-or-treatment hearsay exception.[34] *See Wright v. State*, 154 S.W.3d 235, 241 (Tex.App.-Texarkana 2005, pet. ref'd) (holding that "[w]ithout anything to indicate that R.C. understood the purpose of the interview, and that the importance of being truthful was so Smedley could effectively assess or diagnose her, it was error to admit the videotaped statements"); *see also Jones*, 92 S.W.3d at 623–24; *Moore v. State*, 82 S.W.3d 399, 405 (Tex.App.-Austin 2002, pet. ref'd); *Reed v. State*, No. 02–02–00055–CR, 2003 WL 1894581, at *3 (Tex.App.-Fort Worth Apr.17, 2003, pet. ref'd) (op. on reh'g) (not designated for publication); *compare Green v. State*, 191 S.W.3d 888, 896 (Tex.

App.-Houston [14th Dist.] 2006, pet. ref'd) (holding child had sufficient appreciation for purpose of questions leading to her statement).

We will not reverse a trial court's judgment based on the erroneous admission of evidence, however, unless the error affects a substantial right. TEX. R.APP. P. 44.2(b); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex.Crim.App.1998). Substantial rights are not affected by the erroneous admission of evidence "if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect." *Motilla v. State*, 78 S.W.3d 352, 355 (Tex.Crim.App.2002). Here, Taylor testified at trial. She testified:

Q. I want to ask you, Taylor, if you ever saw Kim being mean to Jorden in any other way?

A. Yes.

Q. Tell me about that.

A. Jorden was watching TV and she stepped on her stomach for no reason.

Q. For no reason. Do you remember seeing that?

A. Uh-huh.

Q. Okay. And was that at your house?

A. Yes. In Gainesville.

Q. And where was Jorden at?

A. She was watching TV laying on the floor on her back.

Because Taylor herself testified that she saw Stevens step on Jorden's stomach, fair assurance exists that the less powerful testimony, cumulative testimony of Switzer

---

**34.** We note that the State makes a compelling argument that Taylor's statement to Switzer is not hearsay at all under Texas Rule of Evidence 801(e)(1)(B). Because we hold that even if Taylor's statement was hearsay and if it was error for the trial court to admit Taylor's statement, any error was harmless, we need not address the State's argument further. *See* TEX.R.APP. P. 47.1; *Shuffield v. State*, 189 S.W.3d 782, 790 (Tex.Crim.App.) (concluding that any error was harmless after assuming without deciding that certain testimony was hearsay), *cert. denied*, —— U.S. ——, 127 S.Ct. 664, 166 L.Ed.2d 521 (2006).

concerning this fact when considered in connection with the other evidence, did not influence the jury or had but slight effect. *Oveal v. State*, 164 S.W.3d 735, 746 (Tex. App.-Houston [14th Dist.] 2005, pet. ref'd) (holding that "a reasonable evaluation of the record gives fair assurance that the error did not influence the jury's verdict or had but a slight effect on the outcome" when the erroneously admitted evidence was cumulative of other admitted evidence), *cert. denied*, 547 U.S. 1116, 126 S.Ct. 1917, 164 L.Ed.2d 671 (2006); *Liggens v. State*, 50 S.W.3d 657, 662 (Tex. App.-Fort Worth 2001, pet. ref'd) (same). We overrule Stevens's second point.

## VI. NO VIOLATION OF STEVENS'S DUE PROCESS RIGHTS

In her third point, Stevens complains that the trial court violated her due process rights by excluding evidence vital to her defense that someone else—specifically, Jorden's father or mother—inflicted Jorden's fatal injuries. According to Stevens, the trial court erroneously excluded testimony from six different witnesses—Yolanda, Lloyd, Jillian Evans, police officer Terry Jackson, Jodi Eaton, and Twyla Mosbee—concerning domestic violence between Yolanda and Lloyd. The trial court repeatedly ruled that it would exclude all evidence of prior domestic abuse between Yolanda and Lloyd absent evidence that at some point Lloyd's physical conduct was directed at one of the children. The trial court admitted evidence, however, that Yolanda and Lloyd had an argument on New Year's Eve, a few days before Jorden's death. And the trial court permitted Stevens to make a bill of exceptions concerning each of the six witnesses' testimony on the issue of prior fighting between Yolanda and Lloyd.

Stevens claims that the trial court's exclusion of the domestic violence evidence constitutes an erroneous evidentiary ruling that violated her due process rights by preventing her from putting on a defense. "Erroneous evidentiary rulings rarely rise to the level of denying the fundamental constitutional rights to present a meaningful defense." *Potier v. State*, 68 S.W.3d 657, 663 (Tex.Crim.App. 2002). There are two distinct scenarios, however, in which rulings excluding evidence might rise to the level of a constitutional violation: (1) a state evidentiary rule which categorically and arbitrarily prohibits the defendant from offering otherwise relevant, reliable evidence that is vital to her defense; and (2) a trial court's clearly erroneous ruling excluding otherwise relevant, reliable evidence which "forms such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense." *Id.* at 659–62, 665. In the first category, the constitutional infirmity is in the arbitrary rule of evidence itself. *Wiley v. State*, 74 S.W.3d 399, 405 (Tex.Crim.App.), *cert. denied*, 537 U.S. 949, 123 S.Ct. 415, 154 L.Ed.2d 294 (2002). In the second category, the rule itself is appropriate, but the trial court erroneously applies the rule to exclude admissible evidence to such an extent that it effectively prevents the defendant from presenting her defensive theory. *Id.* In other words, the erroneous ruling goes to the heart of the defense. *Id.*

Here, Stevens does not complain that the evidentiary rules at issue are arbitrary rules that discriminate against her right to present a defense. Rather, Stevens argues that she should have been entitled to present evidence that Lloyd, Jorden's father, was a physically violent person, reasoning that had jurors been permitted to hear this evidence they might have entertained a reasonable doubt as to her guilt. Thus, she relies on the second type of evidentiary ruling that could conceivably rise to a constitutional violation: a clearly

erroneous ruling that excludes admissible evidence and that effectively prevents the defendant from presenting her defense. Consequently, we proceed to analyze the testimony presented in the bills of exception to determine whether the trial court's evidentiary rulings were clearly erroneous.

### A. Yolanda's and Lloyd's testimony

■ Yolanda and Lloyd both testified at trial. They both testified that they had an argument on New Year's Eve. The trial court limited Stevens's cross-examination of them both, however, concerning any prior physical violence between them because the prior incidents did not involve any physical altercations with the Saager children.

In a bill of exception concerning Yolanda's and Lloyd's testimony about prior physical violence between them, Stevens elicited testimony from both Yolanda and Lloyd that several physical altercations occurred between them while they were stationed at Fort Hood, prior to their move to Gainesville.

■ A trial court has considerable discretion in determining whether to exclude or admit evidence. *See Montgomery v. State*, 810 S.W.2d 372, 379 (Tex.Crim. App.1991) (op. on reh'g); *Rogers v. State*, 183 S.W.3d 853, 857 (Tex.App.-Tyler 2005, no pet.). Absent an abuse of discretion, we will not disturb a trial court's decision to admit or exclude evidence. *See Martin v. State*, 173 S.W.3d 463, 467 (Tex.Crim. App.2005). Under this standard, we will uphold a trial court's evidentiary ruling so long as the ruling is within the "zone of reasonable disagreement." *Id.*

Here, absent evidence that the children became involved in the physical disputes Yolanda and Lloyd previously had when they were living at Fort Hood, we cannot hold that the trial court abused its discretion by excluding this evidence. *See*

Tex.R. Evid. 401, 402, 403; *see also Ellis v. State*, 99 S.W.3d 783, 789 (Tex.App.-Houston [1st Dist.] 2003, pet. ref'd) (holding trial court did not abuse its discretion by excluding evidence).

Finally, when the trial court limited her cross-examination of Yolanda and of Lloyd, Stevens did not raise her due process argument; consequently, this subpoint is not properly before us. *See Kesaria v. State*, 148 S.W.3d 634, 642 (Tex.App.-Houston [14th Dist.] 2004), *aff'd*, 189 S.W.3d 279 (Tex.Crim.App.2006) (citing *Wright v. State*, 28 S.W.3d 526, 536 (Tex.Crim.App. 2000), *cert. denied*, 531 U.S. 1128, 121 S.Ct. 885, 148 L.Ed.2d 793 (2001)).

### B. Jillian Evans

Jillian Evans is Stevens's oldest daughter. Evans testified at trial and in a bill of exceptions. In the bill of exceptions, Stevens asked Evans four questions. Evans said outside the presence of the jury that one of the Saager children had told her that their parents fought all the time. Evans could not remember which of the Saager children had made that statement. At the conclusion of her testimony, Stevens offered the testimony and asked "that it be introduced in front of the jury," and the trial court denied the request.

Here, again, absent evidence that Yolanda and Lloyd's fighting involved some type of physical confrontation with the children, we cannot hold that the trial court abused its discretion by excluding this testimony by Evans. *See* Tex.R. Evid. 401, 402, 403; *Montgomery*, 810 S.W.2d at 379. And Stevens did not object to the exclusion of Evans's testimony on due process grounds, so this subpoint is not properly before us. *See Kesaria*, 148 S.W.3d at 642.

### C. Jodi Eaton and Officer Terry Jackson

Both Jodi Eaton and Officer Terry Jackson testified only via a bill of exceptions. Outside the presence of the jury, Stevens questioned Eaton—who was a neighbor of the Saagers in Gainesville— regarding whether she remembered telling a uniformed officer on January 4, 2000, that she had heard arguing coming from the Saagers' house for approximately ten minutes on the previous night and that it was so loud that she had contemplated calling the police. Eaton responded that she did not recall speaking to a uniformed officer or making this statement; she testified that she thinks she would remember if she had talked to a police officer and had made the indicated statement.

Outside the presence of the jury, Stevens asked Officer Terry Jackson about a statement that he had taken from Jodi Eaton on January 4, 2000, indicating that she had heard an argument occurring on the Saagers' porch the night before and that it had lasted for approximately ten minutes. Officer Jackson stated that he remembered taking the statement. He said that he had borrowed a piece of paper from Eaton's mother to take notes on and that he had prepared a report from those notes immediately after he had left the scene. At the conclusion of Officer Jackson's testimony, Stevens re-offered the testimony of Eaton and Officer Jackson and stated that "[i]t's very important to this case, this bit of information." The State argued that Officer Jackson's testimony was being used only to impeach Eaton. Stevens replied that this was such important testimony that her due process and due course of law rights would be violated if she was not able to introduce it and that she would even be willing to introduce it through Officer Jackson without Eaton being present if the trial court would agree to that. Thereafter, the trial court ruled that the testimony from both

Officer Jackson and Eaton was inadmissible.

But on cross-examination in front of the jury, Stevens elicited testimony from both Yolanda and Lloyd that they had a fight on New Year's Eve. The excluded evidence did not add much, if anything, to Stevens's defense and certainly did not prevent her from putting on a defense. Accordingly, we cannot agree with Stevens that the exclusion of Officer Jackson's and Eaton's testimony violated Stevens's due process rights to put on a defense.

### D. Twyla Molsbee

Twyla Molsbee testified only via a bill of exceptions. Outside the presence of the jury, Stevens questioned Molsbee, who was a nurse and foster mother for the Saager children for a short time, regarding a statement that she had provided to Detective David Wisian. In her statement, Molsbee described rocking Alyssa one night and asking whether Alyssa had ever been hit; Alyssa responded that she had not been hit but that her daddy had hit Jorden when Jorden would cry and that her daddy had hit Branden some. At the conclusion of her bill of exceptions concerning Molsbee, Stevens argued that Molsbee's testimony was so important to her case that her due process rights and her right to due course of law under the Texas and United States Constitutions would be violated if she was unable to put such testimony into evidence. Stevens further requested that the rules of evidence be suspended to allow Molsbee's testimony to be admitted into evidence. The trial court denied this request.

The statement that Stevens sought to admit was clearly hearsay and did not meet any of the hearsay exceptions. *See* TEX.R. EVID. 802, 803. Stevens relies on *Alonzo v. State*, 67 S.W.3d 346 (Tex.App.- Waco 2001, pet. dism'd as improvidently granted), 158 S.W.3d 515 (Tex.Crim.App.

2005), to support her argument that hearsay, which does not quite fit the hearsay exceptions, should be nonetheless allowed: (1) if there is inherent trustworthiness of the hearsay; (2) if there is corroborating evidence that the hearsay is truthful; (3) if the hearsay is important to the determination of guilt/innocence; (4) if the State had an opportunity to examine the declarant of the hearsay; and (5) if the State is unable to demonstrate the unreliability of the hearsay. *Id.* at 360. In *Alonzo,* the court of appeals held that the trial court erred by excluding evidence tending to show that the murder was committed by someone other than the defendant. *Id.* at 361. However, the excluded evidence in *Alonzo* included a videotaped statement by a person who claimed to have been an eyewitness to the killing and said that someone other than the defendant committed the crime as well as statements by four others corroborating and supporting the alleged eyewitness's story of the murder. *Id.* at 356.

In the present case, the excluded hearsay consisted of a statement by then three-year-old Alyssa that her dad hit her brother and sister sometimes. This excluded evidence is not comparable to the excluded eyewitness statement in *Alonzo.* The exclusion of Alyssa's statement to Molsbee did not prevent Stevens from putting on a defense. Lloyd admitted, and testified in front of the jury, that he occasionally spanked the children as a form of discipline. Additionally, in *Alonzo,* the trustworthiness of the videotaped statement by the eyewitness was evidenced by the witness's knowledge of details of the murder that only an eyewitness would know. Here, no such indicia of reliability exist concerning Alyssa's statement. She could have simply been indicating that Lloyd spanked the children on occasion, which he admitted. And finally, Stevens had the opportunity to call Alyssa to testify about her recollection of her statement to Molsbee, but Stevens did not call Alyssa to testify. For these reasons, we hold that the trial court's exclusion of Molsbee's testimony regarding Alyssa's statements did not violate Stevens's due process rights. *See Hall v. State,* No. 05–04–01313–CR, 2005 WL 1706304, at *3 (Tex.App.-Dallas July 22, 2005, no pet.) (not designated for publication).

## VII. CONCLUSION

Having overruled each of Stevens's four points, we affirm the trial court's judgment.